UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04CV11125NG

CHARLES LANGONE, AS FUND MANAGER OF THE NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND,

    Plaintiff

vs.

STAMPRETE OF RHODE ISLAND, STAMP CRETE OF RHODE ISLAND, INC., AND STAMPED CONCRETE, INC.,
    Defendants

DEPOSITION OF LEONARD A. PEZZA, taken pursuant to Notice under the applicable provisions of the Federal Rules of Civil Procedure, on behalf of the Plaintiff, before Alice M.S. DesVergnes, R.P.R., a Notary Public in and for the Commonwealth of Massachusetts, at the office of Casey and Thompson, PC, Eight North Main Street, Suite 204, Attleboro, MA 02703, commencing on Tuesday, April 26, 2005, at 9:30 a.m.

APPEARANCES:

CATHERINE M. CAMPBELL, ESQ.
FEINBERG, CAMPBELL & ZACK, P.C.
177 MILK STREET
BOSTON, MA 02109
  Counsel for the Plaintiff

BRUCE E. THOMPSON, ESQ.
CASEY AND THOMPSON, PC
8 NORTH MAIN STREET, SUITE 204
ATTLEBORO, MA 02703
  Counsel for the Defendant

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD
WEST PEABODY, MA 01960
(781) 581-3993  (978) 535-0313  FAX  (978) 538-3142

---

INDEX

| DEPONENT | DIRECT |
|---|---|
| LEONARD A. PEZZA | |
| By Ms. Campbell | 4 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | Notice of Taking Deposition | 6 |
| 2 | Annual Report-C. Pezza & Son | 10 |
| 3 | Annual Report-Stamp Crete | 10 |
| 4 | Annual Report-Stamped-Concrete | 10 |
| 5 | Remittance report | 35 |
| 6 | Judgment | 35 |
| 7 | Construction Agreement | 48 |
| 8 | Restated Agreement & Declaration of Trust | 51 |
| 9 | Request for Participation form | 53 |
| 10 | Employer Statement of Ownership | 57 |
| 11 | Employer Remittance Report | 61 |
| 12 | August 2003 report | 79 |

---

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that all objections, except as to form, are reserved until the time of trial, including motions to strike.

It is further stipulated and agreed that the reading and signing of the deposition are waived.

LEONARD A. PEZZA, having duly affirmed that his testimony will be the truth, the whole truth, and nothing but the truth and having produced his Massachusetts driver's license for identification purposes, testified as follows in answer to direct interrogatories by Ms. Campbell:

Q  Would you please state your name and address?
A  Yes. Leonard A. Pezza, 11 Winsor Avenue, Johnston, Rhode Island.
Q  And your Social Security number and your date of birth?
A  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; 4/22/36.
Q  Mr. Pezza, have you ever had your deposition

| | | |
|---|---|---|
| 1 | | taken before? |
| 2 | A | Yes, I have. |
| 3 | Q | And what was the occasion for having your |
| 4 | | deposition taken? |
| 5 | A | It was a court case between, um, C. Pezza and |
| 6 | | Son and, um, New England Power. |
| 7 | Q | So you know, having had your deposition taken, |
| 8 | | that you have to respond verbally, that you |
| 9 | | can't shake your head -- |
| 10 | A | Correct. |
| 11 | Q | -- or make noise like um-hum. That might be |
| 12 | | difficult for the court reporter to interpret. |
| 13 | | Other than that, I'm going to ask you a series |
| 14 | | of questions. If for some reason you don't |
| 15 | | understand the question, let me know and I'll |
| 16 | | try to clarify it as best I can. But if you do |
| 17 | | answer, I'm going to assume you understood the |
| 18 | | question. |
| 19 | A | Correct. |
| 20 | Q | Is that fair? |
| 21 | A | Yup. |
| 22 | Q | I'm going to show you a two-page document that |
| 23 | | is the notice of taking deposition. Have you |

Vol. 1 - 7

| | | |
|---|---|---|
| 1 | A | Bachelor of science in business. And I got a |
| 2 | | degree in engineering from the University of |
| 3 | | Rhode Island. That was a night course. |
| 4 | Q | Have you reviewed any documents in preparation |
| 5 | | for the deposition today? |
| 6 | A | Yes, I have. |
| 7 | Q | What were those documents? |
| 8 | A | This is a -- documents that I had signed with |
| 9 | | 251, Local 251, Teamsters. |
| 10 | Q | Anything else? |
| 11 | A | No. |
| 12 | Q | Thank you. And you started by giving me your |
| 13 | | employment history. C. Pezza and Sons, you |
| 14 | | were the vice president initially, you said? |
| 15 | A | Yes. |
| 16 | Q | Who was the president when you were vice |
| 17 | | president? |
| 18 | A | Who was the president when I was vice |
| 19 | | president? My father. |
| 20 | Q | And were there any other officers between '67 |
| 21 | | and '84? He was the president during that |
| 22 | | entire period you were the vice president? |
| 23 | A | And my mother was secretary-treasurer. |

Vol. 1 - 6 (cont.)

| | | |
|---|---|---|
| 1 | | seen this before? |
| 2 | | (Document exhibited to the witness.) |
| 3 | A | Yes, I have. |
| 4 | Q | And are you here pursuant to that notice of |
| 5 | | deposition? |
| 6 | A | Yes, I am. |
| 7 | | MS. CAMPBELL: All right. Can we have |
| 8 | | that marked as Exhibit 1, please? |
| 9 | | (Document marked as Exhibit No. 1 |
| 10 | | for identification.) |
| 11 | Q | Can you just briefly tell me if you have -- |
| 12 | | what your educational background is? |
| 13 | A | Yes, I graduated Providence College. |
| 14 | Q | When was that? |
| 15 | A | 1958. I took a night course at the University |
| 16 | | of Rhode Island in 1960, and that was regarding |
| 17 | | engineering. And I was the president of -- |
| 18 | | vice president first of C. Pezza and Son from |
| 19 | | 1967 to 1984. And in 1984, I purchased C. |
| 20 | | Pezza and Son and became president. |
| 21 | Q | Did you get a degree from Providence College? |
| 22 | A | Yes, I did. |
| 23 | Q | And what was that? |

Vol. 1 - 8

| | | |
|---|---|---|
| 1 | Q | And your mother's name is? |
| 2 | A | Her name was Emma Pezza, E-M-M-A. |
| 3 | Q | You became the president of C. Pezza in 1984 |
| 4 | | you said? |
| 5 | A | Yes. |
| 6 | Q | Were there any other officers of C. Pezza at |
| 7 | | that point? |
| 8 | A | My wife. |
| 9 | Q | Her name? |
| 10 | A | Constance Pezza. |
| 11 | Q | And since that time, from 1984 to the present, |
| 12 | | what has your employment history been, where |
| 13 | | have you worked? |
| 14 | A | My employment history was operating and running |
| 15 | | C. Pezza and Son. |
| 16 | Q | And does that continue until today? |
| 17 | A | No. |
| 18 | Q | Okay. |
| 19 | A | That ended in 19 -- I mean 2003. |
| 20 | Q | And what happened in -- what have you been |
| 21 | | doing since 2003? |
| 22 | A | I'm retired. |
| 23 | Q | And collecting Social Security? |

1  A  Yes.
2  Q  Have you been or are you holding the position
3     of officer in any other corporation?
4  A  No, I am not.
5  Q  I didn't necessarily plan to show you these
6     documents. I don't have additional copies
7     but --
8        MR. THOMPSON: I'm sure we can take care
9     of that.
10 Q  I am able to download annual reports filed by
11    corporations from the Internet. And I've made
12    a copy of three corporations that I got from
13    the Secretary of State's web site in Rhode
14    Island. And just with respect to your response
15    that you are no longer an officer in the
16    corporation, let me show you three documents.
17       One -- I'm going to have these marked by
18    the court reporter -- but first one is a 2004
19    annual report from C. Pezza and Son, Inc.
20       The second is a 2004 report for Stamp
21    Crete of Rhode Island, Inc.
22       And the third is an annual report, 2004,
23    for Stamped-Concrete, Inc. And all of these

1     indicate that Leonard Pezza is an officer. Is
2     that not you?
3  A  Yes.
4  Q  Okay.
5        MS. CAMPBELL: So do you -- let's just
6     have these marked as exhibits.
7     (Documents marked as Exhibit Nos. 2, 3 and 4
8     for identification.)
9  Q  So with this in mind, I'm just going to ask you
10    that question one more time.
11       Have you been or are you an officer in any
12    other corporation?
13 A  Have I been? Yes.
14 Q  Okay.
15 A  Are you? No.
16 Q  Okay. So since 2004, you're no longer an
17    officer of these corporations?
18 A  Correct.
19 Q  So --
20       MS. CAMPBELL: Did you want to point out
21    something?
22       MR. THOMPSON: I just wanted to see what
23    order we have them. Okay. Number 2 is C.

Vol. 1 - 11

Vol. 1 - 12

1     Pezza; No. 3 was Stamp Crete; No. 4 was
2     Stamped-Concrete.
3  Q  Maybe I wasn't clear on my question before.
4     I'm just trying to find out if you were an
5     officer at any time in any other corporations,
6     so not just a question of are you currently,
7     but have you been.
8  A  Yes.
9  Q  And what corporations are those?
10 A  They're the ones you see in front of you.
11 Q  So that's Stamp Crete of Rhode Island --
12 A  Yes.
13 Q  -- and Stamped-Concrete, Inc.?
14 A  Yes.
15 Q  Any others? Or have you been an officer in any
16    other corporations?
17 A  No. Other than C. Pezza and Son.
18 Q  Right. I assume that when you became vice
19    president of C. Pezza and Son, you were the
20    son, is that correct?
21 A  Yes.
22 Q  Is there a son currently involved, or did your
23    son become involved at some point in C. Pezza

1     and Son?
2  A  No.
3  Q  Do you have a son?
4  A  Yes, I do.
5  Q  What is his name?
6  A  I have Robert Pezza and Michael Pezza.
7  Q  All right. Just to start, then, you've been an
8     officer in three corporations. Let's start
9     with C. Pezza and Son. Were you an employee of
10    this company as well?
11 A  Yes, I was.
12 Q  And were you a shareholder?
13 A  Yes, I was.
14 Q  And were there other shareholders or --
15 A  My wife.
16 Q  -- at any time? Okay. What was the division
17    of ownership?
18 A  60/40. 60 me and 60 my wife. 60 Leonard and
19    40 Constance.
20 Q  Were either of your sons or any other family
21    members officers of C. Pezza and Son --
22 A  No.
23 Q  -- at any time?

Vol. 1 - 13

1  A   No.
2  Q   Let me finish the question because it makes it
3      a little difficult for her to record your
4      response if I'm -- my question is still
5      continuing.
6  A   Okay.
7          MR. THOMPSON: Do you understand that?
8      You understand you really need to allow her to
9      finish because, in fairness to all of us,
10     including yourself, you want to make sure you
11     know the full question before you give an
12     answer.
13 Q   I know you're anticipating what I say --
14 A   Exactly.
15 Q   -- but it just makes it very difficult for the
16     court reporter.
17         Okay. And what were your duties at C.
18     Pezza, first let's say as the vice president
19     and then as the president?
20 A   I was in charge of field operations.
21 Q   And this is as the vice president or in both
22     capacities?
23 A   In both capacities.

Vol. 1 - 14

1  Q   What does that mean exactly?
2  A   I was in charge of the -- setting up the
3      production of the jobs.
4  Q   Did you have any other responsibilities?
5  A   No. Except for the field duties, I was in
6      charge of all field duties. Pertaining to the
7      jobs, the operation of the daily jobs.
8  Q   Who was doing the bookkeeping, finance end of
9      the company?
10 A   We had office people.
11 Q   Were you an employee of C. Pezza and Sons as
12     well as an officer and a shareholder?
13 A   I was.
14 Q   You received a W-2 at the end of the year?
15 A   Correct.
16 Q   Who are the directors of C. Pezza and Son?
17 A   Constance and Leonard Pezza.
18 Q   Did C. Pezza and Son ever operate under any
19     other name?
20 A   No.
21 Q   And when was it incorporated, the company?
22 A   I believe in 1967.
23 Q   And who incorporated the company?

Vol. 1 - 15

1  A   I don't know.
2  Q   What type of business was C. Pezza and Son, how
3      would you describe?
4  A   They were site developers and road contractors.
5  Q   Did C. Pezza purchase cement?
6  A   No.
7  Q   Did it process cement to make concrete?
8  A   No.
9  Q   Did it do any excavation?
10 A   Yes.
11 Q   What type of excavation?
12 A   Utilities.
13 Q   Just describe that for me.
14 A   General excavation. General.
15 Q   For purposes of building a road?
16 A   And buildings.
17 Q   And buildings. Okay. Did it sell concrete or
18     any type of concrete materials?
19 A   No.
20 Q   Did it install concrete surfaces?
21 A   Yes.
22 Q   How so?
23 A   They did some sidewalks for the city of

Vol. 1 - 16

1      Providence.
2  Q   Just that one job --
3  A   One job.
4  Q   -- was the only time?
5          Okay. Did it -- did C. Pezza do any
6      installation of driveways or any kind of
7      paving?
8  A   They did asphalt paving.
9  Q   Asphalt paving. And that was for roads?
10 A   Yes.
11 Q   Where was C. Pezza located?
12 A   100 Irons Avenue in Johnston, Rhode Island.
13 Q   And was the phone number of the company this
14     (401)231-6014?
15 A   Yes.
16 Q   Who owns that property?
17 A   Who owned it? Myself and my wife.
18 Q   Do you still own it?
19 A   No.
20 Q   There was a sale of the property?
21 A   Yes.
22 Q   When was that?
23 A   I believe in '03, I think. '03 or the

```
 1       beginning of -- no, '03.  '03.
 2   Q   So that was prior to the receivership?
 3   A   No, after the receivership.
 4   Q   After the receivership. Was it sold as part of
 5       the receivership?
 6   A   No.
 7   Q   And to whom was the property sold?
 8   A   To the town of Johnston.
 9   Q   And what was the sale price?
10   A   1,025,000 or 250 -- one million twenty-five, I
11       think it was.
12   Q   And where did the proceeds of the sale go?
13   A   It went to the bank and the bonding company.
14   Q   Did either or you or your wife receive any
15       money as a result of the sale?
16   A   No.
17   Q   When C. Pezza was located at that address, did
18       it pay -- did the company pay rent to you and
19       your wife?
20   A   Company paid rent back in the '80s, but after
21       that they never paid any rent. They couldn't
22       afford to pay the rent.
23   Q   Did you and your wife hold the property as
```

```
 1       individuals?
 2   A   Yes.
 3   Q   Not as a corporation or as a real estate trust?
 4   A   Um, may have been held in LCP Corp.
 5   Q   When you say "may have been," you're not sure?
 6   A   I'm not sure.
 7   Q   I do have some questions about LCP Corp., but
 8       I'll ask those later.
 9           What about 54 Irons Avenue, was that part
10       of the same property that was owned by yourself
11       and your wife?
12   A   It was a different property.
13   Q   It was a different property. Was it adjoining
14       property?
15   A   No.
16   Q   Can you just describe its location in
17       relationship --
18   A   It was across the street from Irons -- 100
19       Irons Avenue.
20   Q   What about 45 Irons Avenue?
21   A   Forty-five?
22   Q   Yes. Are you familiar with that address?
23   A   I think that may have been the asphalt plant
```

```
 1       property. We had an asphalt plant located on
 2       the same side that C. Pezza is. And I think
 3       that was -- 45? Um --
 4   Q   Was the asphalt plant a different company than
 5       C. Pezza and Son?
 6   A   Yes, it was.
 7   Q   What was the name of that?
 8   A   Granite Asphalt Corp.
 9   Q   And did you have an ownership interest in that
10       company?
11   A   No, I didn't.
12   Q   Who -- okay. I asked you the question did C.
13       Pezza and Son -- strike that.
14           Do you know who owned Granite Asphalt
15       Corp.?
16   A   My son.
17   Q   And your son?
18   A   Robert Pezza.
19   Q   Robert Pezza. And how long has he owned that
20       company?
21   A   From about 1994 or '3 to '97. Yeah, '94 to
22       '97.
23   Q   Did he purchase the company, or was he the
```

```
 1       incorporator of the company?
 2   A   He was the incorporator.
 3   Q   What happened in 1997?
 4   A   What's that got to do with the Teamsters?
 5           MR. THOMPSON: What we're here for is to
 6       conduct discovery which may lead to any
 7       relevant evidence. So we can't take positions
 8       on whether or not it's directly relevant to
 9       your case. They're entitled to ask about
10       potentially related corporations or companies.
11           THE WITNESS: Well, I wasn't related to
12       that at all.
13           MS. CAMPBELL: But I don't know that.
14           MR. THOMPSON: Part of the question might
15       disclose to her that it's unrelated. To the
16       extent you know why it went out of business, I
17       want you to answer.
18   A   Repeat that question.
19   Q   Okay. What happened after 1997?
20   A   It got closed by the Supreme Court.
21   Q   Of the United States?
22   A   State of Rhode Island.
23   Q   Was it an environmental issue?
```

Vol. 1 - 22

```
1   A   No, no, no. It was permitting issue.
2   Q   The permit was withdrawn?
3   A   The permit was withdrawn.
4   Q   I assume there was a court case --
5   A   Yes.
6   Q   -- that involved your son and the company?
7   A   Exactly.
8   Q   Who are the customers of C. Pezza?
9   A   Who were?
10  Q   Yes.
11  A   State of Rhode Island, different local towns,
12      and general contractors.
13  Q   Who were some of the general contractors or who
14      were they?
15  A   I recall Gilbane was one. A lot of out-of-town
16      people.
17  Q   Gilbane is the only one you can recall?
18  A   Locally, yeah.
19  Q   In any sense.
20  A   They were all out of state from California
21      and -- I don't recall the names right now.
22  Q   And how was C. Pezza involved with those
23      out-of-state general contractors? What would
```

Vol. 1 - 23

```
1       Pezza worked in?
2   A   Mass., Rhode Island, Connecticut, New
3       Hampshire. That's it.
4   Q   Okay. How many employees, approximately, did
5       C. Pezza have? I know we're talking about a
6       long period of time. So --
7   A   Maximum?
8   Q   Maximum.
9   A   Probably 100.
10  Q   And would that be -- what would be the average,
11      say, in the last five years before it ceased
12      operation?
13  A   Average, probably 50, 55.
14  Q   What were the job classifications of employees
15      at C. Pezza?
16  A   Operating engineers, laborers, Teamsters,
17      office people, accountants, estimators, general
18      superintendent. That would be it.
19  Q   And the Teamsters that you mentioned, were
20      those individuals who were primarily members of
21      Local 251 in Rhode Island?
22  A   Yes.
23  Q   Were there any who were not Local 251?
```

Vol. 1 - 24

```
1       be the situation?
2   A   Well, they would contact us for a price on
3       bidding a certain job in maybe New Hampshire or
4       Mass. or maybe Rhode Island. And we would bid
5       on it and be elected to do the job. And we
6       performed the services.
7   Q   As a subcontractor?
8   A   As a subcontractor to a general contractor, a
9       major general contractor.
10  Q   Did those jobs that involved general
11      contractors, were they also road building for
12      the public project jobs?
13  A   They were site developments. They weren't
14      really roads. They were site developments.
15  Q   So private contractors?
16  A   Yes.
17  Q   What type of sites?
18  A   Well, power plants, basically power plants.
19      Some bulk cement facility. Basically, that's
20      what we did.
21  Q   And you mentioned that sometimes you would have
22      a job in New Hampshire, sometimes in Rhode
23      Island. What was the geographic area that C.
```

```
1   A   Only when we worked in Connecticut there were
2       different people, but that was about it.
3   Q   Okay. Did you use Teamsters from a Connecticut
4       local in that circumstance?
5   A   Yeah, we used them in Connecticut, and I think
6       New Hampshire too. If I'm not mistaken I think
7       New Hampshire. We had some years ago in
8       Massachusetts Teamsters too.
9   Q   So depend on the location of the job?
10  A   Depends on location, correct.
11  Q   Did -- so C. Pezza had a collective bargaining
12      agreement with Local 251, is that right?
13  A   Yes.
14  Q   And that agreement obligated C. Pezza and Son
15      to make contributions to the New England
16      Teamsters pension fund?
17  A   Yes.
18  Q   When was the last time that C. Pezza was
19      obligated to make contributions to the fund?
20      In other words, when did you have employees,
21      Teamsters employees working for C. Pezza where
22      contributions should have been made to the
23      fund?
```

1  A   Um, probably up to the end of '03.
2  Q   And do you know who the Teamsters were that
3      were working for C. Pezza during that last --
4      '02, '03?
5  A   I think the only Teamster that was working at
6      that point in time was Anthony McGrath.
7  Q   Can you spell his last name?
8  A   Capital M-C, capital G-R-A-T-H, and, um,
9      Douglas Mugeunis, M-U-G-E-U-N-I-S. I think
10     those were the only two at the end. Most of
11     '04 -- I mean '03.
12 Q   What about in '02, were there more people in
13     '03?
14 A   Yeah, there were, a few more.
15 Q   I think I have some documents.
16 A   You probably have the names there.
17 Q   I'll show them to you. In fact, what I'm going
18     to have you do is look at a package of
19     documents, has eight -- sorry, nine pages.
20     They are documents dated from January of 2002,
21     through September of 2002 that indicate
22     primarily what employees worked for C. Pezza
23     and Sons. And there were contributions owed to

Vol. 1 - 27

1  Q   Who was that?
2  A   He was in the office taking care of payroll.
3  Q   Not to be mysterious about these documents, but
4      they were sent to me by your prior counsel,
5      Thomas Plunkett --
6  A   Okay.
7  Q   -- during the time when there was some
8      litigation going on between the Teamsters
9      pension fund and C. Pezza and Sons, and I had
10     requested remittance reports from Mr. Plunkett,
11     and he sent me those documents. So I was
12     hoping that you would be able to tell me who
13     prepared them. Does that help?
14 A   Richard Villanova prepared this one because he
15     signed it.
16 Q   I understand.
17 A   I don't know anything about these.
18 Q   This one we're talking about, the one from
19     January.
20 A   Oh, this one here. Richard Villanova.
21 Q   And you don't know who prepared the subsequent
22     months' remittance reports?
23 A   No.

1      the pension fund as a result of their working
2      under the collective bargaining agreement.
3          Can you just take a look at those for me?
4      (Document exhibited to the witness.)
5  Q   Do you recognize them?
6  A   There's no names here.
7  Q   Nope. There is a signature, though.
8  A   Yup. Okay. What was your question again?
9  Q   Do you recognize these documents? I'm just
10     giving you a chance to look at them, then I'm
11     going to have the court reporter mark them as
12     an exhibit --
13 A   Oh, okay.
14 Q   -- and we can talk about them.
15 A   None of these documents are signed.
16         MR. THOMPSON: Why don't you look through
17     them and then wait for another question
18     concerning them.
19 Q   Do they look familiar to you?
20 A   Yes.
21 Q   Do you know who prepared those documents?
22 A   I only know about this cover sheet because it's
23     signed by Richard Villanova.

Vol. 1 - 28

1  Q   Who would have been the person to prepare them
2      at C. Pezza and Son under normal circumstances?
3  A   Richard Villanova.
4  Q   So he may have prepared the others as well?
5  A   May have.
6  Q   Do you know by looking at the information on
7      the remittance reports, other than the one on
8      the top, whether or not those are correct in
9      terms of the employees that are listed and the
10     hours that are listed, I believe they're from
11     the months of February through September?
12 A   I have no way of knowing. I didn't handle any
13     of this stuff.
14 Q   There is a stamp on the bottom that says C.
15     Pezza, I believe --
16 A   Stamp?
17 Q   -- C. Pezza and Son.
18 A   Well, could have been typed. I have -- I don't
19     believe this was stamped. I believe it was
20     typed.
21 Q   Or typed in, okay.
22         Where or how would I verify that those are
23     the true remittance reports from C. Pezza and

**Vol. 1 - 29**

1   Son?
2 A How would you verify that?
3 Q Right. I mean, if you don't know.
4 A I would think that, I would think that these
5   reports, when they're sent into the Teamsters
6   monthly, they have more detailed information
7   than this. I believe that they're similar to
8   stuff that he signed because I've seen them
9   from other unions and they're signed.
10 Q Right. Those --
11 A These are --
12 Q -- those were given to me at my request from
13   Mr. Plunkett.
14 A I don't know where Tom got them, so --
15 Q Okay. Do you doubt that he got them from C.
16   Pezza and Son?
17 A Oh, I don't -- I guess he did. I don't know.
18   I would think there would be a little more
19   detail than just this.
20 Q That's just what he gave to me.
21 A I don't know. I mean, I would think the union
22   themselves would have them.
23 Q Who was dealing with Mr. Plunkett, this would

**Vol. 1 - 30**

1   have been in 2002, with regard to litigation
2   that was pending with the Teamsters pension
3   fund? Who from C. Pezza?
4 A I would have, I would have been dealing with
5   him. How he got this information, if he
6   received this in a winter, I'm not around in
7   the wintertime. I don't know. I mean, this
8   shows --
9 Q I don't have a copy of his letter to let you
10   know.
11 A You know something, the date's up here, but
12   they're all January.
13 Q I think that's just because it's the January --
14   the month of January.
15 A That's the month. That's just the month, I
16   believe, the 29th through the 26th. That's
17   just the month.
18 Q Right.
19 A I can't answer that.
20 Q Okay.
21 A I would think that -- we always made sure we
22   sent in the reports monthly. So I would say
23   that the Teamsters would have them, the

**Vol. 1 - 31**

1   originals. They don't have them?
2 Q This is all they have.
3 A That's all they have?
4 Q Right.
5 A That's all they ever had?
6 Q For these months?
7 A No, even prior to that.
8 Q Prior to that, I believe, that you're correct
9   that the forms -- looked like the first form
10   that's dated from January. And they were sent
11   directly to the pension fund. These forms were
12   made pursuant to some litigation that was
13   pending with C. Pezza and Son, and these were
14   send by Pezza's attorney to my office. So I'm
15   just trying to verify that the information is
16   correct. The names listed -- are the names
17   listed people who worked for C. Pezza?
18 A Well, there you go again, I mean.
19 Q Do you recognize --
20 A I recognize 90 percent.
21 Q Okay. Who don't --
22 A The only one, the second one down I don't
23   recognize.

**Vol. 1 - 32**

1   MR. THOMPSON: Who's that?
2 A George Hedguist. I mean, he probably, you
3   know, I didn't pay attention to every person
4   that worked for me.
5 Q How many people were working for you at this
6   point, February of 2002?
7 A Well, that's the thing. I don't think we had
8   many people, but 2002, I don't remember who
9   were on a particular job where we had to work.
10   See, Hedguist comes up again in March. All the
11   other people are very familiar to me. They
12   were with me for years and years and years. We
13   got some different people.
14 Q In fact, I don't see that Hedguist is listed on
15   this report, but I don't see that he actually
16   worked any of these --
17 A Oh, I'm sorry. I didn't pay attention to that
18   either. If he didn't work, he didn't work.
19   Oh, he didn't even work. So Caito, Russell
20   Allard, I remember him. All the rest of the
21   people -- Quattrucci, I don't remember him.
22 Q Mr. McGrath is on there, he is someone you
23   mentioned before?

```
1   A   Yeah, he was a steward.
2   Q   He was?
3   A   He was a steward, yes.
4   Q   Douglas Magness, was that maybe the person you
5       were referring to?
6   A   Yes.
7   Q   You thought it was Mugeunis, is that him?
8   A   Please?
9   Q   When I asked you who was working for Pezza in
10      2003, you said Douglas Mugeunis, but when I
11      look --
12  A   Magness, Magness. I didn't say Mugeunis. I
13      said Magness. Maybe you misheard it. I
14      probably spelled it wrong too.
15  Q   That's all right. We have the spelling
16      Magness. That's the person you're referring
17      to?
18  A   Yes.
19  Q   Okay.
20  A   To attest to the fact did these people work for
21      me at the time, I can't honestly say.
22  Q   The W-2 forms that would substantiate their
23      work would be where at this point?
```

```
1   A   We packed up in boxes and -- I don't know.
2   Q   Are they with the receiver?
3   A   Please?
4   Q   Does the receiver have them?
5   A   No, no, we got all the stuff in storage in
6       boxes. Tom may have gotten this -- if he gave
7       this to you, he had to get it from somebody.
8       When did he send this to you?
9   Q   When did he?
10  A   Yes, in '04? '05?
11  Q   I would say at the end of '02.
12  A   Of '02?
13  Q   Yes.
14  A   Oh, that long ago?
15  Q   I believe so.
16  A   You didn't have a cover letter from him at the
17      time? I don't think he would have given you
18      this in '02. Maybe '03?
19  Q   The reason I say that is -- let me give you the
20      next document. Sorry, this is so hard to
21      remember. But this is a document, one-page
22      document. It's a judgment in the District of
23      Massachusetts court, CA No. 02CV11815. And
```

```
1       it's dated November 22nd -- 27th, 2002. Do
2       you recognize that?
3       (Document exhibited to the witness.)
4   A   I don't. I mean, I've seen them. If the
5       question is have I seen it before, yes. If I
6       saw this one, I can't say.
7   Q   All right.
8           MS. CAMPBELL: Let's mark this as Exhibit
9       5. Let's mark the remittance --
10  A   Can I read that one more time?
11          MS. CAMPBELL: Sure. Mark the remittance
12      reports as Exhibit 5 and judgment as Exhibit 6.
13      (Documents marked as Exhibit Nos. 5 and 6
14          for identification.)
15  Q   This judgment, Mr. Pezza, was for contributions
16      that were owed using the remittance reports
17      from February through September that are marked
18      as Exhibit 8. And the judgment is dated
19      November 27th, 2002.
20  A   Okay.
21  Q   So that's why I know that this information was
22      sent to me prior to the judgment being entered.
23  A   Okay.
```

```
1   Q   Let me just ask you. Who is dealing with
2       Mr. Plunkett in the course of this litigation?
3   A   I really was, but, you know, he calls me on a
4       lot of things all the time, and, um, I may have
5       just said to him --
6           MR. THOMPSON: Well, you've got to be
7       careful here. I don't want you testifying to
8       conversations you had with your attorney. You
9       can answer questions as to who --
10  A   Well --
11          MR. THOMPSON: -- who had involvement with
12      him, but without going into detail.
13  A   I get involved with him on all the
14      conversations.
15  Q   Would it be fair for me to ask if you could
16      perhaps speak to Mr. Plunkett and just verify
17      that the information that he sent me was sent
18      from C. Pezza to him and that it's correct,
19      would that be possible for you to do that?
20  A   I could do that, certainly.
21  Q   So then we don't have to go over -- keep going
22      over this information.
23  A   Okay. Yes.
```

| | | |
|---|---|---|
| 1 | | MS. CAMPBELL: Does that sound -- |
| 2 | | MR. THOMPSON: That's fair. |
| 3 | Q | You said that many of the records for C. Pezza |
| 4 | | were boxed up and put in storage, did you do |
| 5 | | that yourself? |
| 6 | A | No. |
| 7 | Q | Who did that? |
| 8 | A | My daughter, and, and I believe before we |
| 9 | | closed up, Richard Villanova. |
| 10 | Q | Do you know where Mr. Villanova is? |
| 11 | A | I don't know where he is. |
| 12 | Q | Do you know where he lived when he was |
| 13 | | employed? |
| 14 | A | He lived in Coventry, Rhode Island. |
| 15 | Q | And your daughter, did she work for C. Pezza? |
| 16 | A | Yes, she did. |
| 17 | Q | And what was her name -- is her name? |
| 18 | A | Cheryl Grecco. |
| 19 | Q | Aside from, then, yourself and your wife and |
| 20 | | your daughter, were there any other family |
| 21 | | members who were working for C. Pezza? |
| 22 | A | Um, no. |
| 23 | Q | Your son Robert never worked there? |

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Or Michael? |
| 3 | A | Oh, Michael did work as an operating engineer. |
| 4 | Q | Was he part of the local union? |
| 5 | A | Fifty-seven. |
| 6 | Q | Let's say from the period of -- see, this is |
| 7 | | 2005, from the period of 1999 to date, did you |
| 8 | | or any of your family members receive from C. |
| 9 | | Pezza any monies other than salary for work |
| 10 | | performed at the company? |
| 11 | A | No. |
| 12 | Q | There were no gifts to you, to your family |
| 13 | | members or -- |
| 14 | A | No. |
| 15 | Q | -- distributions, stock distributions? |
| 16 | A | No. |
| 17 | Q | Where did C. Pezza have its operating and |
| 18 | | payroll accounts, what bank? |
| 19 | A | Citizens. |
| 20 | Q | Did it have an account at Fleet at some point? |
| 21 | A | I don't think so. Payroll? |
| 22 | Q | Payroll or operating. |
| 23 | A | No. |

Vol. 1 - 39

Vol. 1 - 40

| | | |
|---|---|---|
| 1 | Q | No. Had no accounts at Fleet? |
| 2 | A | I can't honestly say. |
| 3 | Q | Who was the accountant for C. Pezza? |
| 4 | A | Fred Santagater. |
| 5 | Q | Was he an employee? |
| 6 | A | Yes. |
| 7 | Q | Can you spell his name for me? |
| 8 | A | S-A-N-T-A-G-A-T-E-R. |
| 9 | Q | How long did he work for C. Pezza? |
| 10 | A | Until '02. |
| 11 | Q | Was there an accountant for the company after |
| 12 | | that time? |
| 13 | A | After that time, there was -- after that time, |
| 14 | | I believe there was, um -- oh, man. Can't |
| 15 | | think of his name. Norm, Norman -- I'll |
| 16 | | remember it. |
| 17 | Q | It might come to you. Let me know if it comes |
| 18 | | to you. |
| 19 | A | Norman. Anyway, that's the start of it. |
| 20 | Q | Did C. Pezza own any equipment or vehicles? |
| 21 | A | C. Pezza and Son? |
| 22 | Q | Yes. |
| 23 | A | Maybe a couple of cars, automobiles. |

| | | |
|---|---|---|
| 1 | Q | Were those automobiles that were used by |
| 2 | | yourself or were they used by other |
| 3 | | companies -- |
| 4 | A | One was used by me. I think that was the only |
| 5 | | one, and there was a couple of pickup trucks |
| 6 | | used by superintendents. |
| 7 | Q | Did it lease any equipment or vehicles? |
| 8 | A | Believe it leased my car. |
| 9 | Q | Did it -- what other equipment did C. Pezza use |
| 10 | | in performing the road work and the other work |
| 11 | | that you described? |
| 12 | A | They leased everything. |
| 13 | Q | They leased everything. Okay. What type of |
| 14 | | equipment did they lease? |
| 15 | A | They leased excavators, trucks, bulldozers. |
| 16 | Q | And -- |
| 17 | A | -- loaders. |
| 18 | Q | Loaders. Anything else? |
| 19 | A | That's it. |
| 20 | Q | And from whom did they lease this equipment? |
| 21 | A | Pezza Equipment Corp. |
| 22 | Q | And where was that company located? |
| 23 | A | Was located at 100 Irons Avenue. |

| # | | |
|---|---|---|
| 1 | Q | Do you know who the officers of that company |
| 2 | | were? |
| 3 | A | I was; my wife. |
| 4 | Q | Were you the incorporator of the company? |
| 5 | A | Please? |
| 6 | Q | Did you incorporate the company yourself? |
| 7 | A | Did I incorporate it? |
| 8 | Q | Yes. |
| 9 | A | No. |
| 10 | Q | Do you know who did? |
| 11 | A | My father. |
| 12 | Q | Do you know when? |
| 13 | A | I believe in the '60s. |
| 14 | Q | Around the same time as C. Pezza? |
| 15 | A | Yes. |
| 16 | Q | And were you and your wife also the owners of |
| 17 | | Pezza Equipment Corp.? |
| 18 | A | We were the stockholders. |
| 19 | Q | When did you become stockholders? |
| 20 | A | When I purchased the company. |
| 21 | Q | And from whom did you purchase the company? |
| 22 | A | From my mother and father. |
| 23 | Q | When was that? |

Vol. 1 - 43

| 1 | A | In 1984. |
|---|---|---|
| 2 | Q | Did your father retire in 1984? |
| 3 | A | Yes. |
| 4 | Q | And you actually purchased it from him, there |
| 5 | | was moneys exchanged? |
| 6 | A | Oh, yes. A lot of money. Go ahead. |
| 7 | Q | How was the ownership divided between -- the |
| 8 | | stocks divided between you and your wife and C. |
| 9 | | Pezza and Pezza Equipment Corp.? |
| 10 | A | I believe the same as C. Pezza. |
| 11 | Q | Sixty to yourself and 40 to your wife? |
| 12 | A | Yes. |
| 13 | Q | What was the arrangement, the lease |
| 14 | | arrangement, between C. Pezza and Pezza |
| 15 | | Equipment? |
| 16 | A | Pezza Equipment would bill C. Pezza for the use |
| 17 | | of the equipment. |
| 18 | Q | And C. Pezza would write out a check on a |
| 19 | | monthly basis? A yearly basis? |
| 20 | A | Yes, monthly. |
| 21 | Q | Monthly. And were those monthly bills paid up |
| 22 | | through the time that C. Pezza ceased |
| 23 | | operations? |

Vol. 1 - 44

| 1 | A | I wouldn't know that. It started getting to be |
|---|---|---|
| 2 | | a mess. I don't know. |
| 3 | Q | Okay. When did it start to get to be a mess? |
| 4 | A | Couple of years prior to that. |
| 5 | Q | So around that 2002 time period? |
| 6 | A | Maybe before that, before that. |
| 7 | Q | 2000? 2001? |
| 8 | A | I'd say around 2000. |
| 9 | Q | Is Pezza Equipment Corp. still operating? |
| 10 | A | Oh, no. |
| 11 | Q | When did it cease? |
| 12 | A | It filed bankruptcy also. |
| 13 | Q | Bankruptcy or the receivership? |
| 14 | A | The receivership. |
| 15 | Q | At the same time that you filed for C. Pezza? |
| 16 | A | I believe yes. |
| 17 | Q | Is the receiver the same for Pezza Equipment |
| 18 | | Corp.? |
| 19 | A | Yes. |
| 20 | Q | What happened to the equipment that was owned |
| 21 | | by Pezza Equipment Corp. and then leased to C. |
| 22 | | Pezza? |
| 23 | A | It was auctioned off. |

| 1 | Q | When was that? |
|---|---|---|
| 2 | A | August of '03. |
| 3 | Q | And what were the proceeds of the auction? |
| 4 | A | What were they? |
| 5 | Q | Yes. |
| 6 | A | I don't know. |
| 7 | Q | If you recall? |
| 8 | A | I don't recall. |
| 9 | Q | Do you know what happened to the proceeds? |
| 10 | A | Went to the receiver and then the bonding |
| 11 | | company. |
| 12 | Q | Did either you or your wife receive any of the |
| 13 | | money as a result of the sale of the equipment |
| 14 | | at the auction? |
| 15 | A | No, I didn't. |
| 16 | Q | Okay. Where did C. Pezza get its asphalt prior |
| 17 | | to your son opening the asphalt company on |
| 18 | | Irons Avenue? I can't remember the name of it. |
| 19 | A | Where? |
| 20 | Q | Yes. |
| 21 | A | Well, we really weren't in the asphalt business |
| 22 | | at that time. So whatever little bit we did, |
| 23 | | we bought from whoever was manufacturing |

```
 1       asphalt in the area.
 2   Q   Okay. Other unrelated --
 3   A   We didn't really get into the asphalt business
 4       at all until we -- you know, we were using
 5       asphalt on our own jobs but subbing it out to
 6       asphalt companies prior to the asphalt plant.
 7       So we didn't put any asphalt down ourselves at
 8       all.
 9   Q   You just did the excavation part of it?
10   A   Yeah, excavation and preparation.
11   Q   Then someone else --
12   A   Then somebody else came in like Cardi or
13       Tilcon. They did it.
14   Q   Just in terms of the property on Irons Avenue,
15       is there a building where C. Pezza was located?
16   A   Yes.
17   Q   An office building?
18   A   Yes.
19   Q   That was 100 Irons Avenue?
20   A   Yes.
21   Q   Then what else was on the property besides the
22       building for C. Pezza?
23   A   That's all.
```

Vol. 1 - 47

```
 1   Q   Was there an asphalt plant?
 2   A   No, that was on other property.
 3   Q   That was on other property.
 4   A   Different property.
 5   Q   Who owned that other property?
 6   A   I did.
 7   Q   Just you personally, not with your wife?
 8   A   No, my wife.
 9   Q   And did you own it as individuals or through
10       that LCP?
11   A   Um, I don't recall.
12   Q   Do you still own that property?
13   A   No.
14   Q   What happened to that?
15   A   Sold it to the town.
16   Q   And what happened to the proceeds of that sale,
17       was that part of the 1 million or was that a
18       separate sale?
19   A   That was part of the 1 million.
20   Q   And do you and your wife continue to own any of
21       the property that was located on Irons Avenue?
22   A   No.
23   Q   Was it all sold in that sale to the town?
```

Vol. 1 - 48

```
 1   A   Yes.
 2   Q   Are you familiar with a company called
 3       Stamprete of Rhode Island?
 4   A   Stamprete?
 5   Q   Uh-huh.
 6   A   No.
 7   Q   Do you recall signing a collective bargaining
 8       agreement with Local 251 that did not involve
 9       C. Pezza and Son?
10   A   Yes.
11   Q   Okay. Show you a copy of the Rhode Island
12       Heavy Highway Construction Agreement, it's
13       dated 2000 to 2003. Can you just take a look
14       at that?
15       (Document exhibited to the witness.)
16          Now, you said you had signed another
17       collective bargaining agreement with Local 251
18       that was not C. Pezza. Is that the agreement
19       that you signed?
20   A   Yes.
21   Q   Okay.
22          MS. CAMPBELL: Let's just mark that as
23       Exhibit 7.
```

```
 1       (Document marked as Exhibit No. 7
 2          for identification.)
 3   Q   Going to give this back to you. If you could
 4       just take a look at page 17.
 5       (Document exhibited to the witness.)
 6          Is that your signature?
 7   A   Yes, it is.
 8   Q   It says SUP, or looks like SUP. Do you know
 9       what that means, after your signature?
10   A   I don't know what it means.
11   Q   And what is the name of the company on this
12       agreement?
13   A   Says Stamprete. I've never heard of that name.
14   Q   Of Rhode Island. And what's the address?
15   A   45 Irons Avenue.
16   Q   And the phone number?
17   A   231-6014.
18   Q   Is that the same phone number as C. Pezza?
19   A   Yes.
20   Q   So if you've never heard of this company, who
21       wrote it on this document?
22   A   I don't know. I didn't. I think that's just a
23       misprint. There was no such thing as a
```

```
1           Stamprete.
2   Q       But you signed it?
3   A       Yes, I signed it.
4   Q       So if it wasn't Stamprete, what was it? Who
5           were you signing for?
6   A       Should have been Stamp Crete of Rhode Island.
7   Q       Is that the company currently in receivership?
8   A       That's in -- that was in receivership, yes. I
9           believe that went in receivership in '03.
10  Q       So it's your testimony that there was no
11          company called Stamprete?
12  A       Right, no.
13  Q       How did it come about that this agreement was
14          signed, what happened?
15  A       Well, C. Pezza and Son lost the workers' comp,
16          and we had to cease operations because we
17          didn't have any workers' comp. So Stamp Crete
18          had two people that worked for it, and they had
19          a Workers' Comp policy. So they took over the
20          payroll for C. Pezza and Son. C. Pezza and Son
21          would give Stamp Crete the money to front the
22          payroll, to pay for it just to keep the jobs
23          going so they can get finished.
```

```
1           And that's what happened, why it was
2           running. And the union called and said, you
3           know, you can't pay benefits if the payroll is
4           under another company. I said, well, they're
5           still going to get paid through Pezza because
6           they did receive checks through Pezza at the
7           time.
8                   They said to make it legitimate you really
9           have to get into -- you know, Stamp Crete has
10          to get into a contract to make it legitimate.
11          And that's how it happened.
12  Q       Stamp Crete existed prior to the signing of
13          this agreement that we marked as Exhibit No. 7?
14  A       Yes.
15  Q       Okay. You said it had two employees?
16  A       Yes. Two nonunion employees.
17  Q       When did Stamp Crete of Rhode Island come into
18          existence?
19  A       Stamp Crete?
20  Q       Yes.
21  A       Um, exactly, I can't remember, but
22          approximately I would say '97.
23  Q       Okay. I'm going to show you another -- just
```

Vol. 1 - 51

```
1           take a minute and I'm going to put the ones
2           that are marked in a pile.
3                   (Discussion off the record.)
4   Q       I'm going to show you another document that is
5           a multipage document. It's the New England
6           Teamsters and Trucking Industry Pension Fund
7           Agreement and Declaration of Trust. And it has
8           a stamped received date of March 7th, 2003.
9           Would you just take a look at that for me?
10                  (Document exhibited to the witness.)
11                  Does that look familiar?
12  A       Yes.
13  Q       Okay. Is it a document that you signed?
14  A       Yes.
15              MS. CAMPBELL: Let's have that marked as
16          Exhibit No. 8.
17              (Document marked as Exhibit No. 8
18                  for identification.)
19  Q       Mr. Pezza, could you look at Appendix A, which
20          is, I believe, two pages from the back.
21  A       This one, yes.
22  Q       Is that your signature?
23  A       Yes.
```

Vol. 1 - 52

```
1   Q       Above your signature, what does it say is the
2           name of the employer?
3   A       Stamprete.
4   Q       Could you just read the full name?
5   A       Of Rhode Island, Incorporated.
6   Q       Underneath it says what address?
7   A       45 Irons Avenue, Johnston, Rhode Island..
8   Q       Now, there's a name of a company above your
9           signature and the address is below your
10          signature, but you do not -- you did not fill
11          out the name of the company or the address?
12  A       I don't know who filled it out.
13  Q       You know for sure you did not fill it out, is
14          that what you're telling me?
15  A       Right. These were both done the same day.
16  Q       I don't think there's a date on --
17  A       I think it's just a misspelling, that's all.
18  Q       Okay. And again, you've signed it as Leonard
19          A. Pezza?
20  A       SVP, I don't really know what that means. I
21          don't know. I don't know if Joe Bairos filled
22          it out or --
23  Q       Well, just -- I'm assuming that he filled out
```

| | | |
|---|---|---|
| 1 | | the Teamsters Local 251. It doesn't look to me |
| 2 | | like the same writing as the writing of |
| 3 | | Stamprete. |
| 4 | | You're saying you don't know of any |
| 5 | | corporation called Stamprete, that's your |
| 6 | | testimony? |
| 7 | A | Correct. |
| 8 | Q | You signed right under the Stamprete of Rhode |
| 9 | | Island? |
| 10 | A | Right. |
| 11 | Q | Going to have you look at another document |
| 12 | | which is entitled "New England Teamsters and |
| 13 | | Trucking Industry Pension Fund Request For |
| 14 | | Participation." Do you recognize that? |
| 15 | | (Document exhibited to the witness.) |
| 16 | A | No. |
| 17 | Q | Is that your signature at the bottom? |
| 18 | A | That's my signature, yes. |
| 19 | | MS. CAMPBELL: Why don't we mark that as |
| 20 | | Exhibit No. 9. |
| 21 | | (Document marked as Exhibit No. 9 |
| 22 | | for identification.) |
| 23 | Q | So there is the signature on the bottom. This |

Vol. 1 - 55

| | | |
|---|---|---|
| 1 | A | Zero employees? I don't know. |
| 2 | Q | You didn't fill out that part? |
| 3 | A | No. |
| 4 | Q | Is it your testimony that you didn't fill out |
| 5 | | No. 2 either, or list the name of the company |
| 6 | | and the address? |
| 7 | A | Only thing I can testify is I signed it. Who |
| 8 | | printed it, I don't know. |
| 9 | Q | It is confusing. |
| 10 | A | Very. Understand -- you got to understand |
| 11 | | where this was done. |
| 12 | Q | Why don't you explain it to me. |
| 13 | A | It was done in a coffee shop between two cups |
| 14 | | of coffee. But anyway.... |
| 15 | Q | Okay. And who was there? |
| 16 | A | Joe Bairos and I. |
| 17 | Q | Going to show you one more document in this |
| 18 | | group. And it's the New England Teamsters and |
| 19 | | Trucking Industry Pension Fund Employer's |
| 20 | | Statement of Ownership. |
| 21 | | MS. CAMPBELL: Do you not have a copy? |
| 22 | | MR. THOMPSON: I have one page. Just go |
| 23 | | off for a minute. |

| | | |
|---|---|---|
| 1 | | is your signature on the bottom of the page |
| 2 | | with that SVP, correct? |
| 3 | A | Um-hum. |
| 4 | Q | And what does it -- this is a request for |
| 5 | | participation. Do you know what that means? |
| 6 | A | Requesting me to sign these documents, I guess. |
| 7 | Q | For the pension fund office, is that right? |
| 8 | A | Request for participation. Yes. Right, |
| 9 | | correct. |
| 10 | Q | And the document says: Part 1 is to be |
| 11 | | completed by the local union and Part 2 to be |
| 12 | | completed by the employer. Is that right? |
| 13 | A | Correct. |
| 14 | Q | All right. Number 2 says: Name of company. |
| 15 | | What does that say? |
| 16 | A | Says Stamprete of Rhode Island. |
| 17 | Q | Inc.? |
| 18 | A | Incorporated. |
| 19 | Q | And 45 -- |
| 20 | A | 45 Irons Avenue, Johnston, Rhode Island. |
| 21 | Q | It also says that "This contract covers |
| 22 | | approximately zero employees." What does that |
| 23 | | mean? |

Vol. 1 - 56

| | | |
|---|---|---|
| 1 | | (Discussion off the record.) |
| 2 | Q | Attorney Thompson has pointed out that -- of |
| 3 | | the documents that we have looked at, in |
| 4 | | particular the one that was marked Exhibit 9, |
| 5 | | there is a second page that should have been |
| 6 | | included. And that second page also appears to |
| 7 | | be signed by Mr. Pezza and Mr. Bairos. And it |
| 8 | | starts with the No. 3 and has Part 2 and the |
| 9 | | Part 3 on it. |
| 10 | | So I'm just going to have you look again |
| 11 | | at Exhibit No. 9. And if you could just look |
| 12 | | at the second page of Exhibit No. 9 and tell me |
| 13 | | whether that's your signature -- |
| 14 | A | Yes. |
| 15 | Q | -- on the bottom of the second page as well. |
| 16 | | MR. THOMPSON: I think you answered. Did |
| 17 | | you answer? |
| 18 | A | Please? |
| 19 | | MR. THOMPSON: Is that your signature? |
| 20 | A | I said yes. |
| 21 | | MR. THOMPSON: It's my hearing. |
| 22 | A | That's all right. No problem. |
| 23 | Q | After that there's a little scribble, says |

```
1       Leonard L. Pezza; do you know what that is,
2       that little mark?
3   A   I don't know. Probably means president. I
4       don't know.
5   Q   Okay. So meaning president?
6   A   That's Stamprete, they left the C out --
7   Q   Okay.
8   A   -- of the Crete. That's what it amounts to.
9       It's done on all of them.
10  Q   It's done on every single one?
11  A   Yeah.
12  Q   And now I'm going to give you the document I
13      described earlier which was the New England
14      Teamsters and Trucking Industry Pension Fund
15      Employer's Statement of Ownership.
16  A   Yes.
17  Q   Do you recognize this document?
18  A   Well, I've seen it places before.
19  Q   Okay. Do you remember --
20          MS. CAMPBELL: Let's have this marked as
21      Exhibit No. 10.
22      (Document marked as Exhibit No. 10
23          for identification.)
```

Vol. 1 - 59

```
1   Q   Let me see.
2       (Discussion off the record.)
3   Q   All right. Well, that's easy enough to verify.
4   A   I just don't recall it. It could be right. I
5       don't know.
6   Q   Okay.
7   A   I can't attest to it because I don't remember.
8   Q   Do you remember that this page was part of the
9       documents that you signed in the coffee shop?
10  A   No.
11  Q   Fair enough. The date on these documents is
12      May 28th, 2002; does that seem to be the right
13      date to you?
14  A   This document?
15  Q   Not this one?
16  A   This one? May 28th, 2002. What was your
17      question?
18  Q   Does that seem to be the right date? Is that
19      the date you recall going to the coffee shop
20      and signing these documents?
21  A   I can't say. I don't know.
22  Q   Was it 2002?
23  A   I don't know. I know I signed it, but I don't
```

```
1   Q   Now, this document says the name of the company
2       is, again, Stamprete of Rhode Island, Inc., is
3       that correct?
4   A   Yes.
5   Q   And the principal office is at 45 Irons
6       Avenue --
7   A   Yes.
8   Q   -- in Johnston? It says the form of business
9       is a corporation?
10  A   Yes.
11  Q   And that the corporation was incorporated in
12      1999?
13  A   That's what it says.
14  Q   Okay. Now, you're saying that Stamprete is a
15      misprint, it should have said Stamp Crete?
16  A   Yes.
17  Q   Was Stamp Crete incorporated in 1999?
18  A   I don't know.
19  Q   Maybe?
20  A   I would have thought it was way before that.
21  Q   Really?
22  A   I would think it was before that, but I'm not
23      sure. You have the --
```

Vol. 1 - 60

```
1       know if that was the date.
2   Q   Do you know if that was the year?
3   A   No, that's the part I don't know, the year.
4       I'm not sure about the year.
5   Q   Would you have signed a document with the wrong
6       date on it?
7   A   Probably not, but I didn't write the date in,
8       so --
9   Q   Okay. I guess the thing that is somewhat
10      confusing to me is that when you look at the
11      statement of ownership, it is Stamprete of
12      Rhode Island, but you don't even know if the
13      date of incorporation is correct. So what
14      would you -- what did you think this was? The
15      name is wrong and the date is wrong?
16  A   I thought it was incorporated before that, I
17      would think. You could find that out easier
18      than me.
19  Q   Okay. But you think this should have said
20      Stamp Crete of Rhode Island, this document --
21  A   Yes.
22  Q   -- the employer statement of ownership?
23  A   Exactly. Definitely. That's just a misprint.
```

Vol. 1 - 61

1  Q  Just to add to somewhat to this confusion, I'm
2     going to show you a package of documents that
3     are also remittance reports of the New England
4     Teamsters and Trucking Industry Pension Fund.
5     And these are remittance reports from Stamprete
6     of Rhode Island. Have a date stamp received by
7     the fund office, various dates, October 2003
8     through June 2004. It's a multipage document.
9         Would you just take a look at that,
10    please?
11    (Document exhibited to the witness.)
12        Do these documents look familiar to you at
13    all?
14 A  The document itself is a familiar document to
15    me. The document was made out by the Teamsters
16    not by anybody else. It was mailed to 45 Irons
17    Avenue.
18 Q  Okay.
19    MS. CAMPBELL: Let me have the court
20    reporter mark this as Exhibit 11.
21    (Document marked as Exhibit No. 11
22        for identification.)
23 Q  So looking at the Exhibit No. 11, you're saying

Vol. 1 - 62

1     that this document was made out by the pension
2     fund?
3  A  Yes.
4  Q  It was mailed to Stamprete of Rhode Island?
5  A  Right.
6  Q  Then those things are printed on the form?
7  A  Yes.
8  Q  Then there are handwritten dates,
9     October 5th -- I'm just looking at the first
10    page here, October 5th, October 12th. Are
11    you saying that the pension fund filled that
12    out as well?
13 A  I don't know who filled it out. This was not
14    even signed, so I don't know who filled it out.
15 Q  Also is written in handwritten "no work"?
16 A  Right.
17 Q  If I were to tell you that the -- someone for
18    the pension fund were to come in and testify
19    that this remittance report was received by
20    the -- was first sent out by the pension fund
21    blank to the address listed here to the company
22    Stamprete of Rhode Island --
23 A  Correct.

Vol. 1 - 63

1  Q  -- it was returned to the fund with the
2     handwritten date and the word "no work" --
3  A  Right.
4  Q  -- do you know if you or any company that
5     you're involved with received this remittance
6     report from the fund when it was originally
7     mailed out?
8  A  Do I know?
9  Q  Yes.
10 A  On this sheet, I don't know.
11 Q  Any of these sheets?
12 A  On the second sheet, I don't know. On the
13    third sheet, Steve Libutti signed it on 1/29
14    when I was in Florida.
15 Q  Who is Steve?
16 A  Steve Libutti is a salesman for, for
17    Stamped-Concrete. Who gave him permission to
18    send these out, I don't know. I wasn't there.
19 Q  Who would have been in charge when you were in
20    Florida?
21 A  Nobody in charge of paperwork when I'm in
22    Florida.
23 Q  You said you had --

Vol. 1 - 64

1  A  Actually, the office was closed. No concrete
2     work going on in the wintertime. But I know he
3     used to go in and open the mail. Wasn't on any
4     payroll, but I know who he is. And how he ever
5     signed these and sent these back, I guess
6     because he figured there was no work, so he
7     sent them back. And the balance of them are
8     signed, but there's no dates on the top. Just
9     the date that he signed them all on the 29th of
10    January.
11 Q  Can you explain why a salesman for
12    Stamped-Concrete would be signing documents for
13    Stamprete of Rhode Island?
14 A  I don't know. I wasn't there. And on 4/2, I
15    wasn't there. Now, this last one, which has no
16    date on it, but it says "company in
17    bankruptcy," it says "copy to contractor." I
18    don't know who wrote that there. And
19    next-to-the-last page it says "company in
20    bankruptcy, no longer in business." I don't
21    know --
22 Q  I think that's just a duplicate.
23 A  Oh, is it?

1  Q  Sorry, he copied it twice.
2  A  But I can't attest to these here forms at all.
3  Q  Okay. Now, who would have been at -- if
4     Stamprete is a misprint and Stamp Crete is not,
5     is the correct name, in October, were you at
6     the company?
7  A  Please?
8  Q  In October of 2003, would you have been there?
9  A  Oh, yeah.
10 Q  And who would have filled out this form, who
11    would be responsible for doing that in
12    October 2003?
13 A  I don't know. I don't know.
14 Q  Was there any office staff?
15 A  At that time my daughter would have been there.
16    But -- I don't know if she did it. Then
17    there's no dates after the first two, except
18    for the ones that Steve Libutti signed the two
19    stamped October 27th. It says "no work '03."
20    The company was shut down at that time, C.
21    Pezza, and was gone.
22       MR. THOMPSON: Are those October ones
23    duplicates of each other?

Vol. 1 - 67

1     filing, this is when the judge signed the order
2     appointing Mr. Peruchi as receiver.
3        MS. CAMPBELL: As permanent receiver?
4        MR. THOMPSON: Yes, permanent.
5        MS. CAMPBELL: First, there must be some
6     order appointing him as temporary receiver
7     sometime prior. So you might be right. It
8     could be sometime in 2003. I didn't have that
9     information.
10 A  But, like I say, unless Norman Goodman.
11    Goodman.
12 Q  Do you know where he is from?
13 A  I don't know where he went. He may have, he
14    may have -- believe he was there in '03. He
15    was.
16 Q  If he were there, he would have been the person
17    who would have been filling these out?
18 A  Yeah, but then, you know, the other ones after
19    that were January, so when did they come in?
20 Q  I was hoping you could tell me.
21 A  I don't know. They're all Januaries. There's
22    only two in October.
23 Q  This is what the fund received, so that's all I

1        MS. CAMPBELL: I'm not sure. This is what
2     I received from the fund.
3        MR. THOMPSON: Mine look like duplicates.
4        MS. CAMPBELL: They do look similar, but I
5     did receive these separately from the fund, so
6     I'm not sure. One has a circle on it and one
7     doesn't.
8        MR. THOMPSON: I see that, No. 4.
9        MS. CAMPBELL: Makes me think they are
10    different.
11 A  I don't remember when Stamp Crete went in
12    receivership. May have been '03. I don't
13    know. May have been '03 when they want in
14    receivership.
15       MS. CAMPBELL: Do you have that
16    information?
17 A  I think they did go like August of '03.
18       MR. THOMPSON: Stamp Crete of Rhode
19    Island, Inc., I have the judge's order
20    appointing a receiver, and it's dated
21    June 16th of '04. 2004.
22 A  '04.
23       MR. THOMPSON: Well, that's not when the

Vol. 1 - 68

1     have to work with.
2        In any case, just to get back to
3     Stamped -- Stamp Crete of Rhode Island.
4  A  Stamp Crete?
5  Q  Stamp Crete.
6  A  Okay.
7  Q  That existed at some point prior to the signing
8     of the collective bargaining agreement, we're
9     not sure when?
10 A  Right.
11 Q  Sometime in the late '90s?
12 A  Right.
13 Q  And in what was its business?
14 A  They did patios, all private work. Driveways,
15    front sidewalks for people, not city sidewalks,
16    you know, home sidewalks, pool aprons. That's
17    what they did. That was their work.
18 Q  Okay. I'm just going to go through this list.
19    Did they purchase cement? Did they purchase
20    cement?
21 A  Yes.
22 Q  Process cement to make concrete?
23 A  No. They purchased Redi-Mix Concrete, not

| | | |
|---|---|---|
| 1 | | cement. |
| 2 | Q | Did Stamp Crete excavate where the concrete was |
| 3 | | to be poured or the Redi-Mix? |
| 4 | A | Yes, they would. |
| 5 | Q | And did they do site excavation? |
| 6 | A | No. |
| 7 | Q | Did it sell concrete and related materials? |
| 8 | A | No. |
| 9 | Q | Install concrete surfaces? |
| 10 | A | Yes. |
| 11 | Q | Sell lawn ornaments? |
| 12 | A | No. |
| 13 | Q | Install concrete driveways? |
| 14 | A | Yes. |
| 15 | Q | Sidewalks? |
| 16 | A | Residential sidewalks, not public sidewalks. |
| 17 | Q | And was it considered a paving contractor? |
| 18 | A | No. |
| 19 | Q | What would it be considered, if not -- |
| 20 | A | It's a cement contractor. |
| 21 | Q | A cement contractor. |
| 22 | A | Actually, not cement, cement is the powder. |
| 23 | | Concrete contractor. |

Vol. 1 - 71

| | | |
|---|---|---|
| 1 | A | Shareholders. |
| 2 | Q | You saying there were no shareholders? |
| 3 | A | There was me and my two daughters. |
| 4 | Q | And okay. And which two daughters, Cheryl was |
| 5 | | one? |
| 6 | A | Cheryl and Cynthia. |
| 7 | Q | And Cynthia? |
| 8 | A | Manzillo. |
| 9 | Q | How were the shares divided between the three |
| 10 | | of you? |
| 11 | A | They were -- I don't know. |
| 12 | Q | Equally? |
| 13 | A | I think so. I think they are equally divided |
| 14 | | up. |
| 15 | Q | And why was this company formed? |
| 16 | A | For them to do something. Say with work. |
| 17 | Q | And did the company have employees? |
| 18 | A | They had a couple of cement finishers, concrete |
| 19 | | finishers. |
| 20 | Q | When you say couple, two? |
| 21 | A | Two. |
| 22 | Q | And where was it located, Stamp Crete? |
| 23 | A | Stamp Crete was located at -- It was actually |

| | | |
|---|---|---|
| 1 | Q | I apologize if I already asked you this before, |
| 2 | | but who incorporated stamped -- Stamp Crete of |
| 3 | | Rhode Island? |
| 4 | A | I believe Haig Basarmian. |
| 5 | Q | Can you give us a spelling? |
| 6 | A | B-A-S-A-R-M-I-A-N. |
| 7 | Q | And were you ever an owner of Stamp Crete of |
| 8 | | Rhode Island? |
| 9 | A | Was I an owner? |
| 10 | Q | Yes. |
| 11 | A | I was an officer. |
| 12 | Q | An officer. But not an owner? |
| 13 | A | No. |
| 14 | Q | Who is Mr. Basarmian? |
| 15 | A | He is an attorney. |
| 16 | Q | He is an attorney? |
| 17 | A | He just incorporated it, that's all. |
| 18 | Q | Who was the owner of the company? |
| 19 | A | There was no owner, just officers. |
| 20 | Q | Well, when you incorporate a company, you do |
| 21 | | issue shares? |
| 22 | A | Stocks, right, shares. |
| 23 | Q | And those shares are issued to individuals? |

Vol. 1 - 72

| | | |
|---|---|---|
| 1 | | located at 54 Irons Avenue. |
| 2 | Q | Where is 54 Irons Avenue in relation to 100 |
| 3 | | Irons Avenue or 45? |
| 4 | A | It's across the street on a different parcel of |
| 5 | | land, and there was an office trailer there. |
| 6 | Q | So it operated out of an office trailer? |
| 7 | A | Yes. |
| 8 | Q | Different building than C. Pezza? |
| 9 | A | Oh, yes. |
| 10 | Q | And who owned that property? |
| 11 | A | I did. My wife and I. |
| 12 | Q | Your wife and yourself. Did you own it as |
| 13 | | individuals or through that LCP Corp.? |
| 14 | A | I think it was through LCP Corp. |
| 15 | Q | Was that property also sold as part of that |
| 16 | | million-dollar sale to the town? |
| 17 | A | No, no. |
| 18 | Q | Do you still own that property? |
| 19 | A | Yes, I do. |
| 20 | Q | What is there now? |
| 21 | A | What's there now? |
| 22 | Q | Right. |
| 23 | A | Office trailer. |

1  Q   Is there a business operating at that address?
2  A   Yes.
3  Q   What business is that?
4  A   Stamped-Concrete.
5  Q   When Stamp Crete was operating out of that
6      location, did the company pay any rent to LCP
7      Corp.?
8  A   Yes, it did.
9  Q   On a monthly basis?
10 A   Yes.
11 Q   Was there a written lease?
12 A   Yes.
13 Q   And who are the officers of the company? I
14     think we talked about the shareholders, who are
15     the officers?
16 A   We were, that was it.
17 Q   The three of you?
18 A   Yes.
19 Q   Who held which office?
20 A   I think I was vice president.
21 Q   Just looking at this 2004 -- I don't know if
22     this was always true, but this was one place --
23 A   That's what Stamp Crete -- that's Stamp Crete.

1  Q   Right. You're listed as vice president and
2      treasurer.
3  A   Of Stamp Crete?
4  Q   Um-hum.
5  A   Where do you see that? Oh, okay.
6  Q   You signed this, correct?
7  A   Yes. I was vice president and treasurer, and I
8      signed it as president.
9  Q   So who was president?
10 A   My daughter Cheryl, I think, was president.
11 Q   Cheryl. What was your job in this company?
12 A   My job?
13 Q   Um-hum.
14 A   Um, I just kind of went out and looked at jobs
15     and gave prices sometimes, and sometimes Steve
16     did it. I didn't do very much.
17 Q   So you acted like an estimator, somewhat?
18 A   Yes, somewhat.
19 Q   And Steve is who?
20 A   Steve Libutti, he's a salesman.
21 Q   I thought you said he was a salesman for
22     Stamped-Concrete, did I misunderstand?
23 A   We're talking about -- no, Stamp Crete.

Vol. 1 - 75

1  Q   He was a salesman for Stamp Crete?
2  A   Right.
3  Q   Not for Stamped-Concrete?
4  A   No.
5  Q   And what were your daughters' responsibilities
6      in the Stamp Crete?
7  A   They did the billing.
8  Q   Both of them, the same --
9  A   Yeah.
10 Q   -- the same job?
11 A   Well, two hours a day, if you want to call that
12     both of them.
13 Q   So were you essentially running this business?
14 A   No, they were. They were, but they had an
15     answering machine, so they did what they had to
16     do and they would go home.
17 Q   What were the revenues of the company like?
18 A   They were never much, maybe 150 grand total.
19 Q   Were the employees a union?
20 A   No.
21 Q   Cement finishers?
22 A   No.
23 Q   And they never had more than two employees?

Vol. 1 - 76

1  A   Two, all they had.
2  Q   Are you saying from -- in your earlier
3      testimony, just to clarify this for me, that
4      although there was a collective bargaining
5      agreement signed, and I'll assume for
6      argument's sake it should have said Stamp Crete
7      and not Stamprete, there were no Teamsters on
8      the payroll of Stamp Crete?
9  A   I don't know. Of Stamp Crete? There was only
10     Teamsters on the payroll of Stamp Crete because
11     they were Pezza people working for Pezza. But
12     they were on Stamp Crete's payroll only because
13     of the Workers' Comp because we didn't have
14     any.
15 Q   So there actually was a transfer of the
16     employees of C. Pezza to --
17 A   Stamp Crete.
18 Q   -- Stamp Crete of Rhode Island?
19 A   Right, to keep Pezza's jobs going to finish
20     them.
21 Q   So when the employees received their paychecks,
22     it said Stamp Crete of Rhode Island?
23 A   Exactly. In fact, I actually ran one week

Vol. 1 - 79

```
1    without Workers' Comp. I know, I know. That's
2    when I decided, everybody says you better not
3    pull that, you can get in trouble. But I was
4    just in the middle of it all and we got the
5    notice, and I just had to keep going. And then
6    I said stop. And we did, we shut down until I
7    just turned it over. You know, turned the
8    paperwork over so we could get the thing going
9    again.
10 Q  What do you mean get the thing going again?
11 A  Well, get the work going. I mean, we didn't
12   have any Workers' Comp.
13 Q  So you waited until you transferred the
14   employees over?
15 A  So I had to get the approval, had to have the,
16   you know, the Workers' Comp, had to tell them
17   what I was doing. Now all of a sudden they're
18   going to see a lot of people on the payroll,
19   you know.
20 Q  And they were -- Workers' Comp insurer was all
21   right with that?
22 A  Yes.
23 Q  And who continued to lease the equipment for
```

Vol. 1 - 80

```
1    the Pezza jobs?
2  A  Well, it still was the same. The only thing we
3     did was change the payroll from C. Pezza
4     because Pezza Equipment Company never had
5     payroll. Never.
6  Q  Just purchased the equipment and then leased it
7     to C. Pezza, that's what --
8  A  Exactly, and it stayed that way. Didn't
9     change.
10 Q  So I'm going to show you another document.
11       MR. THOMPSON: Can we take a five-minute
12    break?
13    (Recess taken.)
14 Q  I'm going to show you two other documents.
15    Two-page document. The documents are from the
16    Stamp Crete of Rhode Island with information
17    regarding employees and hours worked for the
18    months of August 2003 and September of 2003.
19    These were documents I received from Local 251,
20    not from the pension fund.
21    (Document exhibited to the witness.)
22       Take a look at those.
23       MS. CAMPBELL: I'm not sure I gave this to
```

Vol. 1 - 79

```
1     you or not.
2        MR. THOMPSON: Okay.
3  Q  Do these look familiar to you?
4  A  The document looks familiar, yes.
5  Q  Okay. And would you agree that it comes from
6     Stamp Crete of Rhode Island?
7  A  I don't know.
8        MS. CAMPBELL: Well, let's mark it as
9     Exhibit No. 12.
10   (Document marked as Exhibit No. 12
11      for identification.)
12 Q  I know this is difficult to read this document,
13    the names under the name, but it looks to me
14    like Michael Gallagher, Douglas Magness,
15    Anthony McGrath, Carlos Paglereni?
16 A  Paglilarini.
17 Q  Thomas Perna, Paul Russo, Richard --
18 A  Vadenais.
19 Q  And Mark Voelker. And I think that these are
20    the same names that were on the remittance
21    reports that we looked at earlier --
22 A  Yes.
23 Q  -- from C. Pezza?
```

Vol. 1 - 80

```
1  A  Yes.
2  Q  And now they're on Stamp Crete of Rhode Island?
3  A  Yes.
4  Q  But your prior testimony clarifies that what
5     had happened was those people were moved from
6     the C. Pezza payroll to this Stamp Crete
7     payroll, is that right?
8  A  Correct.
9  Q  Looks like there were four people on this list
10    who were actually working. Who would have
11    filled this out for Stamp Crete during this
12    time period?
13 A  I would say Richard Villanova.
14 Q  He was still there?
15 A  Yes. He was still working for C. Pezza.
16 Q  So he was on the C. Pezza payroll?
17 A  No -- yes. No, no, they're all on Stamp Crete
18    payroll.
19 Q  Everybody moved?
20 A  Everybody moved over, yes.
21 Q  Including yourself?
22 A  Um, I -- my last pay was March of '03 was the
23    last time I got paid. Long time.
```