```
1        MR. THOMPSON: Long time without pay.
2        THE WITNESS: Still that way.
3   Q    What about the residential work that Stamp
4        Crete was doing, did that continue during this
5        time period that the Pezza people were on the
6        Stamp Crete payroll?
7   A    I think so. Pretty sure.
8   Q    What kind of concrete work were -- was Stamp
9        Crete doing, was it doing that stamped
10       concrete?
11  A    Exactly. Those two employees would not show up
12       on a Teamster report.
13  Q    No, I understand that you said they weren't
14       members of a union either.
15  A    Exactly.
16  Q    How many people would have been on the
17       Stamped-Concrete payroll during this time
18       period, when you moved them from Pezza to Stamp
19       Crete, how many employees were --
20  A    Totally.
21  Q    Yeah.
22  A    I don't know.
23  Q    The operating engineers would have been the
```

```
1        same, the laborers would be the same?
2   A    Right, the office people.
3   Q    Office people, everybody?
4   A    Yeah.
5   Q    All right. There are two receiverships filed.
6   A    Yes.
7   Q    Can you just -- let's start with C. Pezza, tell
8        me what happened. What led to their
9        receivership being filed?
10  A    What led to it?
11  Q    Yes.
12  A    When they found out how many dollars we owed
13       the U.S. government in payroll taxes, that was
14       the key.
15  Q    So payroll taxes were not paid?
16  A    No.
17  Q    And why was that?
18  A    Correct, they were not paid.
19  Q    Why was that?
20  A    Why was that? They didn't have no money. They
21       used that, I guess, they just didn't have the
22       money. They had the money to make the payroll,
23       didn't have the money to pay the taxes.
```

```
1   Q    When you say "they," who are you referring to?
2   A    Well, the crew that worked for C. Pezza. C.
3        Pezza was still operating as a company, except
4        for the people that had to be under Workers'
5        Comp, but they still worked for C. Pezza. They
6        were doing all C. Pezza work.
7   Q    And who was responsible for making those
8        payroll tax payments?
9   A    C. Pezza.
10  Q    Who at C. Pezza?
11  A    Richard Villanova, he was the office man. He
12       was the guy doing the payroll.
13  Q    Were you aware that the payroll taxes --
14  A    I wasn't aware until it got to be a mess, and
15       then I was aware when it got to be really a
16       disaster.
17  Q    Were you not actively working for C. Pezza at
18       this point?
19  A    Yeah, but I never got involved with office
20       work. I was -- in C. Pezza I was the outside
21       guy. I controlled all the outside work. I
22       never got involved with any office work at all.
23       I had enough people in there that I felt as
```

```
1        though were professionals.
2   Q    And they were professionals but they weren't
3        owners of the company?
4   A    They weren't owners, no.
5   Q    So can you explain what happened that caused
6        all of these financial problems such that the
7        payroll taxes weren't paid?
8   A    Well, we had, we had a big job at the Home
9        Depot in North Kingston that didn't pay us.
10  Q    Why was that?
11  A    Um, there was a big extra -- and rather than
12       get into the whole detail that would take me
13       two hours, it was an extra that they refused to
14       pay. So I put a lien on the property.
15       And when I put a lien on the property,
16       Home Depot had to sue them in Georgia. And by
17       the time I, little old Lenny Pezza goes to
18       Georgia, you know what was going to happen
19       there, and I had to come up with a hundred
20       grand.
21       So we put the lien on the property, and
22       they didn't really want to pay me anymore. So
23       they were holding out moneys from me and my
```

```
 1      the receivership?
 2  A   Just the building.
 3  Q   They -- C. Pezza owned the building?
 4  A   No, C. Pezza didn't even own the building. The
 5      only thing C. Pezza had was -- nothing, they
 6      owned nothing really, to speak of. They had a
 7      lot of bills, had a lot of problems, but they
 8      didn't own a thing. I owned the building. But
 9      I had to give the building up to pay the bank
10      off and the bonding company.
11  Q   Because you had signed personal guarantees on
12      the bonds, is that why?
13  A   Yeah, right. I had a personal guarantee on the
14      bond. Oh, sure.
15  Q   So Pezza Equipment owned the equipment, and you
16      and your wife, either as individuals or through
17      this LCP Corporation, owned the property --
18  A   Right.
19  Q   -- and C. Pezza got the jobs. And until,
20      whenever it was, May of '02, had the people?
21  A   Exactly.
22  Q   Okay. So when the people got moved over to
23      Stamp Crete, was really not much left of C.
```

```
 1      Pezza?
 2  A   Right. Really. Yeah.
 3  Q   Is that right?
 4  A   Yeah. But they still had the obligation to
 5      give me money for the payroll because I didn't
 6      have the money for the payroll. Stamp Crete
 7      never generated any money to speak of. They
 8      had to get the money over to me.
 9  Q   C. Pezza signed the contract?
10  A   Yeah, they signed the contract, right. The
11      money was coming through, as it was moving
12      along, it was coming through.
13  Q   How long did the situation go on where Stamp
14      Crete was really -- took over the payroll of C.
15      Pezza?
16  A   Um, from -- wasn't that long. I think it was
17      just probably the portion of '03.
18  Q   Well, I just saw that those documents were
19      signed in May of '02, and --
20  A   That's what I don't understand --
21  Q   -- Exhibit No. 12 goes through --
22  A   That's December '03.
23  Q   Well, it's for August and September of '03.
```

```
 1  A   Okay. September and August, right, of '03.
 2  Q   But you think that May 2002 date is too early?
 3  A   That don't sound right to me because '02 was
 4      when I had a meeting with the Teamsters. Was
 5      just around Christmastime because I was going
 6      to Florida, and they said you got to sign an
 7      agreement. That was just around the end of
 8      '02.
 9          I said, well, I'm going to Florida, we'll
10      sign an agreement, and I'll make some payments
11      to you people for what I owe you. I'll get
12      them squared away in the beginning of '03, you
13      know, I was going to make the monthly payments.
14      January, February, March, I was going to make
15      XXX.
16  Q   I think that your attorney was negotiating with
17      me at that point, but you may have been
18      negotiating with Joe Bairos on the health
19      insurance, were you?
20  A   Yeah, I was. I was talking to him too. But
21      I'm sure it was like the end of '02. And
22      that's why I don't understand how that stuff
23      got signed way in the middle of '02. I
```

```
 1      remember because I was going to Florida. Maybe
 2      it was November. I was going to be going to
 3      Florida in January. I said, I'm going to be
 4      going to Florida, but they're going to have
 5      orders to give you some checks January,
 6      February, March. And then in April I'll start
 7      doing some work and I can probably clean you up
 8      by May. But that all didn't happen. I got a
 9      couple checks out, and that was it. Couldn't
10      get any more checks out.
11  Q   You're talking about '03?
12  A   '03.
13  Q   That's when things fell apart?
14  A   Yeah, they started falling apart.
15  Q   Did Stamp Crete continue to operate after C.
16      Pezza filed for receivership or was placed in
17      receivership?
18  A   Yes, Stamp Crete continued to operate, yes.
19  Q   And until when, until what period?
20  A   I think it was -- when did you say they filed,
21      in June of '04?
22          MR. THOMPSON: Earlier we looked at the
23      appointment of receiver as June of '04, but we
```

| | | |
|---|---|---|
| 1 | | don't know from that -- |
| 2 | A | It probably operated up until close to that |
| 3 | | time, maybe up -- maybe because it don't do |
| 4 | | anything January, February, March. |
| 5 | Q | Okay. So '03 not '04? |
| 6 | A | This is '03. So don't do anything January, |
| 7 | | February, and March. But Pezza, whatever Pezza |
| 8 | | had to do, it still had to go through them. |
| 9 | | But Pezza went into receivership in '03? Yeah, |
| 10 | | Pezza went into receivership I believe in |
| 11 | | August of '03. |
| 12 | Q | I'm sorry -- |
| 13 | A | It wasn't '04 at all. It wasn't '04. Pezza |
| 14 | | was in receivership in '03. |
| 15 | Q | Stamp Crete continued for some period after |
| 16 | | that, is that what you're saying? |
| 17 | A | Yeah, they -- then they were operating on their |
| 18 | | own little thing. |
| 19 | Q | And that is operating with this payroll of |
| 20 | | Teamsters or operating -- |
| 21 | A | Well, whoever was still on the payroll. But if |
| 22 | | Pezza went into receivership -- in bankruptcy, |
| 23 | | I keep saying receivership, but bankruptcy -- |

| | | |
|---|---|---|
| 1 | | they went into -- Stamp Crete took over the |
| 2 | | payroll, and they were starting to have a |
| 3 | | problem with Stamp Crete with the payroll taxes |
| 4 | | until I found out, and that's when I said |
| 5 | | that's going to be it. |
| 6 | Q | So Stamp Crete also had problems with payroll |
| 7 | | taxes? |
| 8 | A | Because of payroll taxes, exactly. And it was |
| 9 | | just carrying over. In other words, they |
| 10 | | weren't paying it, and then it started -- the |
| 11 | | same thing was happening, because actually the |
| 12 | | Pezza people were making all the stuff out and |
| 13 | | had to give Stamp Crete the money to make the |
| 14 | | payroll. And little did I know that they were |
| 15 | | giving just enough money to give them the |
| 16 | | payroll. And that's the same problem was |
| 17 | | happening all over again until it got up to |
| 18 | | like a hundred grand, and I said, that's it. |
| 19 | | That's it. |
| 20 | Q | Who are those people? |
| 21 | A | People in Pezza's office. |
| 22 | Q | Who are they? |
| 23 | A | Well, Richard Villanova and everybody else is |

| | | |
|---|---|---|
| 1 | Q | It is a receivership, actually. |
| 2 | A | It was a receivership, yeah, it was. |
| 3 | Q | Yeah. |
| 4 | A | If they went in in '03, they had payroll up |
| 5 | | until the time they went in that had to get |
| 6 | | paid. |
| 7 | Q | So this Workers' Compensation problem |
| 8 | | happened -- |
| 9 | A | September, this had to be the last. |
| 10 | Q | The Workers' Compensation issue happened before |
| 11 | | Pezza went into receivership? |
| 12 | A | Oh, yeah. Oh, yeah. Oh, yeah. |
| 13 | Q | Okay. |
| 14 | A | That -- I wasn't even thinking about closing it |
| 15 | | until I found out about all the problems going |
| 16 | | on, but that was -- and I had to switch it |
| 17 | | over. I think if I knew the problems then, I |
| 18 | | wouldn't have switched it over. I would just |
| 19 | | have said that's it. |
| 20 | Q | And what happened that made you file or did a |
| 21 | | creditor file for receivership for Stamp Crete? |
| 22 | A | Stamp Crete. Okay. Here it is. When Pezza |
| 23 | | had a problem with the payroll taxes, okay, |

| | | |
|---|---|---|
| 1 | | in there. Fred Santagater and all the |
| 2 | | people -- well, Fred had left at the time. |
| 3 | | Fred, I think, was out of there just about that |
| 4 | | time. And then there was this new guy Norman. |
| 5 | Q | They were keeping it from you that the company |
| 6 | | didn't have enough money? |
| 7 | A | See, what happened, they never said anything. |
| 8 | | My company, everybody was afraid to talk to me |
| 9 | | because I used to have a short fuse anyways, so |
| 10 | | they were always afraid and they never say |
| 11 | | anything to you. And then, of course, when I |
| 12 | | knew a big check was coming in, because I knew |
| 13 | | when the money was coming in, I'd say, okay, |
| 14 | | you got to pay this, you got to pay this, you |
| 15 | | got to give the Teamsters some money, then you |
| 16 | | got to give the operating engineer some money. |
| 17 | | And I would just spiel names off, and they |
| 18 | | would write them all down. I forget about the |
| 19 | | payroll taxes, wouldn't even give it a thought. |
| 20 | | They never mentioned it to me, I never gave it |
| 21 | | a thought. They should have said to me, oh, |
| 22 | | you've got payroll taxes to take care of. They |
| 23 | | never said nothing until it started getting out |

1     of hand with Pezza, and then the same thing was
2     happening here.
3 Q Were these same people who were doing Pezza
4     payroll also doing Stamp Crete payroll?
5 A Yeah, same thing, never changed. They did
6     in-house payroll.
7 Q Were there two different bank accounts?
8 A Oh, yeah. They were separate, yeah.
9 Q Were they both with Citizens?
10 A I think -- no, I think, Pezza was always with
11     Citizens, but I think Stamp Crete was with
12     Fleet, I think.
13 Q Now, was Stamp Crete still operating out of the
14     trailer?
15 A Yes.
16 Q The same phone number as C. Pezza and Son on
17     these 2004 annual reports?
18 A Stamp Crete had its own phone number, but when
19     they started, they started using 6014, so
20     within the flyers that they had made up, that
21     number was always there plus their own number.
22     And so they just kept using the same number and
23     their own number.

Vol. 1 - 103

1 A Yeah.
2 Q What was handed over to the receiver, what did
3     the receiver do in both of these receiverships?
4 A What did he do?
5 Q Um-hum, yes.
6 A He got a list of people that were owed money.
7 Q And has he been collecting the receivables?
8 A There was no receivables at Stamp Crete to
9     collect. There was none in Stamp Crete to
10     collect.
11 Q Just payables?
12 A Just payables.
13 Q And primarily the payroll taxes?
14 A Payroll taxes.
15 Q Was the Stamped-Concrete business continuing
16     during this time?
17 A It had slowed right down because it was getting
18     to be towards the end of the year, and it just
19     slowed down. It's not a big operation, anyway,
20     to start with.
21 Q Did the receiver get any money for C. Pezza,
22     was he able to --
23 A To get any money for C. Pezza?

1 Q They had a separate number?
2 A They had a separate number, but they still used
3     a Pezza number too. And they just kept it
4     until I had to get rid of it. I just cut it
5     off and got rid of it.
6 Q Okay. Where are the payroll records, the
7     general ledgers, the tax returns of Stamp
8     Crete?
9 A They're in boxes with everything else.
10 Q You have them?
11 A Yeah, they're in the trailer. They're in a big
12     box trailer.
13 Q And C. Pezza's financial records are somewhere
14     else?
15 A No, they're probably in the same place.
16 Q And is this the same trailer on that property?
17 A Yeah. Well, no, these are box trailers, you
18     know, the box trailers you see go up and down
19     the highway?
20 Q Yeah.
21 A That's what they're in. The trailer I'm
22     talking about is an office trailer.
23 Q Are they both on that 54 Irons --

Vol. 1 - 104

1 Q Yeah. For -- did he collect any of the
2     receivables?
3 A For C. Pezza?
4 Q Yes.
5 A Oh, yeah. Any money that came in for C. Pezza
6     went to him.
7 Q Do you know how much he has collected?
8 A We're trying to get -- Tom Plunkett has been
9     trying to get a total on what's going on, but
10     we just can't seem to get it. We don't know
11     where we stand.
12 Q Who is actually doing the collection of the
13     receivables? Is it the receiver or Tom
14     Plunkett?
15 A No, it's the receiver.
16 Q Tom Plunkett is just --
17 A Tom, I told him, you got to find out what's
18     going on, what's happening. I just want an
19     accounting of what took place.
20 Q So you're not getting an accounting either?
21 A No. I don't want to say too much about lawyers
22     but --
23     MR. THOMPSON: You can say nice things

1              about present company.
2     A       Things seem to fly out the window and stuff,
3              especially if you leave it too long. But they
4              want to go after Home Depot now. And, you
5              know, I'm kind of reluctant about them going to
6              Home Depot because I want to know where we
7              stand. I don't want them going to Home Depot
8              if they have got a couple of bucks of my money
9              and spend that up and say we lost the case.
10    Q       Have any payments been made to any creditors by
11             the receiver?
12    A       You know, I don't know. I have a very close
13             friend of mine that is owed 3,000 bucks. I'm
14             trying to get him paid. He keeps calling me up
15             monthly and keeps telling me it never came.
16             And I told him, if you got any money, just pay
17             this guy, please. I mean, he is a personal
18             friend of mine. 3,000 bucks. Not a big deal.
19             But, you know, pay him. If you don't have it,
20             tell him you don't have it. They don't say
21             that either.
22    Q       All right. Tell me about Stamped-Concrete.
23                    MR. THOMPSON: Inc.

1     Q       Is that Inc.? Stamped-Concrete, Inc., when was
2              that company started?
3     A       That started -- I don't know. You tell me,
4              it's over here.
5     Q       I'm not sure it's on the annual report.
6     A       Maybe it's not over here. Stamped-Concrete.
7              File date, 3/1/04. Is that the first date? I
8              thought it started -- I thought it started
9              August of '03.
10    Q       Who started it? Who was -- who incorporated
11             the company?
12    A       I did.
13    Q       Is it still operating?
14    A       Yes, it is, but I'm not part of it.
15    Q       You started it in August of '03?
16    A       I think it was August or September.
17    Q       Where is it located?
18    A       Well, it's located at my house right now.
19    Q       Was it at some point located at 54 Irons?
20    A       Yes, it started.
21    Q       Before that --
22    A       It started around that time and stayed there
23             for most of '04, and then I got out of it.

1     Q       What kind of business was Stamped-Concrete --
2              sorry, that's right, Stamped-Concrete?
3     A       Yeah, it does residential work. Strictly
4              residential.
5     Q       Has it purchased cement?
6     A       No, purchased concrete.
7     Q       Concrete. Does it do excavation work --
8     A       No.
9     Q       -- where the concrete is to be poured?
10    A       No.
11    Q       Does it do site excavation?
12    A       No.
13    Q       Does it sell concrete?
14    A       No.
15    Q       Install concrete surfaces?
16    A       Yes.
17    Q       Does it sell lawn ornaments?
18    A       No.
19    Q       Sorry, you're listed in the phone book as
20             selling lawn ornaments.
21    A       Oh, it does? Is that right, in the phone book?
22    Q       Well, on the Internet there's a SuperPages put
23             out by Verizon and that's one of the

1              categories.
2     A       Oh, no kidding. Great. Guess we should get
3              some, huh?
4     Q       Does it install driveways and sidewalks?
5     A       Concrete.
6     Q       Concrete. Stamped concrete?
7     A       Yeah.
8     Q       And is it a paving contractor?
9     A       No.
10    Q       How was the work that Stamped-Concrete's doing,
11             you know, was incorporated to do was different
12             than what Stamp Crete was doing?
13    A       Well, Stamp Crete was doing it's own excavation
14             and everything, but Stamped-Concrete doesn't.
15             Homeowner has to have it ready. And the only
16             thing they go in and form it and stamp it,
17             color it. And they don't do any regular
18             concrete where Stamp Crete did regular
19             concrete.
20    Q       Oh, it did?
21    A       It did. Meaning, it didn't have to be stamped.
22    Q       Okay. This is only stamped?
23    A       That's it.

| | | |
|---|---|---|
| 1 | Q | Is there some company that makes the stamped |
| 2 | | concrete? I saw that there are many vendors of |
| 3 | | stamped concrete. |
| 4 | A | Oh, they make the pattern that you use to stamp |
| 5 | | it. |
| 6 | Q | So you buy that from -- |
| 7 | A | You have to buy it from a company, yeah. |
| 8 | Q | The colors as well? |
| 9 | A | Yes. |
| 10 | Q | Was Stamp Crete doing that same kind of |
| 11 | | stamping of the concrete? |
| 12 | A | Yeah, they did that also, yes. |
| 13 | Q | How many employees does Stamped-Concrete have? |
| 14 | A | Three. |
| 15 | Q | Who are they? |
| 16 | A | Oh, one is a salesman, and I'm sorry, four. |
| 17 | | Three installers and one salesman. |
| 18 | Q | Who are the installers, do you know? |
| 19 | A | Yeah, they're just workers. |
| 20 | Q | Are they the same people that were working for |
| 21 | | Stamp Crete? |
| 22 | A | No, no, no, nope. |
| 23 | Q | Who's the salesman? |

| | | |
|---|---|---|
| 1 | Q | Is there a sales agreement? |
| 2 | A | Oh, yes. |
| 3 | Q | Now, you said Michael was an operating |
| 4 | | engineer -- |
| 5 | A | Yes. |
| 6 | Q | -- and he was working for C. Pezza? |
| 7 | A | Well, he used to work for C. Pezza, then he |
| 8 | | left C. Pezza when it closed and went to work |
| 9 | | for Fleet Construction. You must be familiar |
| 10 | | with that name. |
| 11 | Q | Unfortunately, I'm also familiar with that |
| 12 | | name. |
| 13 | A | And he worked with Fleet up until January. |
| 14 | Q | And is that when the sale took place? |
| 15 | A | Yeah, right after that. |
| 16 | Q | And you have a written agreement? |
| 17 | A | Oh, yes. |
| 18 | Q | He is the sole shareholder? |
| 19 | A | Yes. Him and his wife. |
| 20 | Q | And his wife's name is? |
| 21 | A | Lynn. |
| 22 | Q | Lynn Pezza? |
| 23 | A | Lynn Pezza. |

| | | |
|---|---|---|
| 1 | A | Steve Libutti. |
| 2 | Q | What about your daughters, are they still |
| 3 | | involved? |
| 4 | A | No, they're not involved. |
| 5 | Q | Who is the owner of the shares of |
| 6 | | Stamped-Concrete? |
| 7 | A | Michael Pezza. |
| 8 | Q | Is that from the beginning, or is that changed |
| 9 | | since the company was initially formed? |
| 10 | A | That changed. |
| 11 | Q | Who was initially the owner of the company? |
| 12 | A | I took it over and started it again under |
| 13 | | Stamped-Concrete. |
| 14 | Q | So when the shares were issued, they were just |
| 15 | | issued in your name? |
| 16 | A | Yeah, then I issued them to -- I sold them to |
| 17 | | Michael. |
| 18 | Q | When did you sell them to Michael? |
| 19 | A | This year. |
| 20 | Q | Did he pay you? |
| 21 | A | Did he pay me? |
| 22 | Q | Yes. |
| 23 | A | Not yet. But he will. |

| | | |
|---|---|---|
| 1 | Q | And it's operating out of your house? |
| 2 | A | Yeah, because he lives in North Smithfield, and |
| 3 | | so I have an office in my house and I put the |
| 4 | | desk there. |
| 5 | Q | That's January of 2005 the sale took place? |
| 6 | A | Yes. Actually February. |
| 7 | Q | February. What are the revenues of |
| 8 | | Stamped-Concrete? |
| 9 | A | What are they? |
| 10 | Q | Yes. I mean, from -- I assume you may not know |
| 11 | | from January of the sale. |
| 12 | A | Well, there's no revenue yet this year, just |
| 13 | | started because, you know, the weather has been |
| 14 | | tough. So -- I don't really know what the |
| 15 | | sales are going to be. |
| 16 | Q | How did it go the first year? |
| 17 | A | The first year, not very well. Not very good. |
| 18 | Q | More than 100? |
| 19 | A | Oh, no, no. Oh, no. Probably about 100. No, |
| 20 | | didn't do very well at all. |
| 21 | Q | Why is that, do you think? |
| 22 | A | Help don't show up; who comes in, disaster. |
| 23 | | Cement finishers are tough people. They like |

1   to get paid daily. So they drink at night.
2   Terrible people.
3 Q Okay. Did the same installers that worked for
4   you last year, are they working for your son
5   this year?
6 A No.
7 Q He has different people?
8 A Different people.
9 Q Is this the only job your son has is this
10  company?
11 A That's it. Going to give it a try and see how
12  he does. If he can't make it, he is just going
13  to close it.
14 Q So really Stamped-Concrete just continued the
15  concrete part of Stamp Crete's business?
16 A No, actually Stamp Crete was really -- didn't
17  do any business really towards the end, and it
18  was just phasing out. And I tried to get it
19  going again, you know, tried to see if I could
20  generate some money out of it. But I had to
21  put money into that, too, myself personally.
22 Q And what money did you put -- what did you get
23  for the money that you invested, what

Vol. 1 - 115

1   rented some stamps because I didn't really want
2   to buy them because I didn't know what it was
3   going to do. And I bought color as I needed
4   it. If I needed 20, 30 pails of color for the
5   job, I bought 20, 30 pails of color for that
6   job. And that was it. I didn't do many jobs.
7   I did probably seven, eight jobs and that's all
8   I did, and this year came to an end. Last year
9   came to an end. And so now I told Michael if
10  he wanted to do it, go ahead and try it, you
11  know.
12 Q How much did you sell the business for, to your
13  son?
14 A Well, he owes me the money that I put into it.
15 Q Right.
16 A Not the payroll taxes. He don't owe me any
17  payroll taxes. That was Stamp Crete. So he
18  owed me some money I put into this thing. And
19  he is going to have to pay me after a year. I
20  gave him a year to pay me.
21 Q How much?
22 A Well, I figured he is going to owe me about 25,
23  30 grand.

1 Q equipment, what assets?
2 A I didn't get any assets. I didn't get anything
3   because the stamps were worn out. They didn't
4   have any vehicles. They were using Pezza
5   vehicles at the time, renting them. Pezza
6   closed up so they didn't have any vehicles.
7   That's why I kind of tapered down, I didn't
8   want to start buying trucks because I didn't
9   know which way we were going to go. They had
10  the color, the color you use it as you go
11  along. You don't buy color in advance. So
12  there really wasn't anything except it owed me
13  a lot of money. It owed me a lot of money.
14 Q How much?
15 A Because Stamp Crete, I had to pay the payroll
16  taxes. I had it pay it myself. I was stuck
17  with it.
18 Q So do you have a claim in the receivership?
19 A Yes, I do. Yes, I do.
20 Q And then you formed Stamped-Concrete, you had
21  to purchase what in order to make the business
22  run?
23 A I had to purchase some -- I rented stamps. I

Vol. 1 - 116

1 Q Altogether?
2 A Altogether, yeah. But that's money I put into
3   the company. It's on the books. So I'm not
4   looking for it now, but I'd kind of like to get
5   it if he makes a go of it.
6 Q Does he currently have any other equipment or
7   vehicles, Stamped-Concrete?
8 A He bought a couple of vehicles. He bought a
9   couple of vehicles, and that's what he is using
10  right now.
11 Q What did you use when you were running --
12 A I didn't use anything. I used my son, my other
13  son's got a pickup truck and I used that to do
14  a couple, two or three jobs because we were
15  going to shut it down. I was going to shut
16  that down, too, because it wasn't doing it.
17 Q When you pour the concrete, is there some kind
18  of equipment that you need in order to make the
19  concrete?
20 A No, the concrete comes all mixed in the truck.
21  You buy that from a vendor, somebody else. You
22  just call, tell them what you need, they ship
23  it to you. They pour it down, so you need

Vol. 1 - 118

```
1    rakes, shovels. $100 worth of tools you got
2    them all.
3  Q And the stamps?
4  A And the stamps. You rent the stamps. You can
5    rent the stamps by the day. The stamps are
6    expensive when they're new. They wear out and
7    they get soft and fragile and they don't stamp
8    properly after three years or so.
9  Q What are they made of?
10 A They're made of hard rubber.
11 Q Were the -- were there any customers of Stamp
12   Crete that were also customers of
13   Stamped-Concrete?
14 A No, cause customers, individual one job, that's
15   all they are. You know, an individual person
16   like you, you'd want a driveway or sidewalk and
17   it's done, it's done. You don't have accounts
18   where you keep going back now.
19 Q What was the geographic area that Stamp Crete
20   was doing this kind of --
21 A Basically, Rhode Island.
22 Q How about Stamped-Concrete?
23 A Well, they're advertising in the book now, the
```

Vol. 1 - 119

```
1    new book. Mass., parts of Massachusetts, you
2    know, see if they can branch out a little bit,
3    if he can get it.
4  Q Have they ever done any work in Massachusetts?
5  A Years ago. Years ago, Stamp Crete did some
6    work in Massachusetts.
7  Q Who is doing the books for Stamped-Concrete?
8  A Michael's wife, she is an accountant.
9  Q Did they have the same phone number as Stamp
10   Crete?
11 A Yes. No. No, no, no. Yeah, they do. Yeah,
12   they do. They have the same number because all
13   the pamphlets were made up and the home shows
14   and everything were the same number. So they
15   had to, you have to keep letting that number
16   follow you or else you're out of business.
17 Q Was that the C. Pezza number?
18 A No, that C. Pezza number is gone. It's a
19   different number entirely.
20 Q It's just been gone since you filed these
21   annual reports? I think they all have the same
22   number, I could be wrong.
23 A No.
```

Vol. 1 - 120

```
1  Q No, this one, I see, Stamped-Concrete has
2    231-2033.
3  A 7033.
4  Q 7033. Okay.
5  A Yes. 7033.
6  Q Okay. I'm just going to take a look at my
7    notes for a minute and see if I have any other
8    questions.
9  A Okay. You want all these papers back?
10      (Recess taken.)
11 Q Okay. Just a couple more questions.
12      Was the accountant who was doing the -- do
13   you have an outside accountant for C. Pezza, or
14   just the person who was employed by the
15   company?
16 A Inside.
17 Q And did that person prepare the tax returns?
18 A Yes.
19 Q Did that person prepare the tax returns for
20   Stamp Crete as well?
21 A No. Oh, Stamp Crete?
22 Q Stamp Crete.
23 A No. No. Caplan & Moran did that.
```

```
1  Q What about Stamped-Concrete, did you file a tax
2    return?
3  A The -- no, I had hired a guy on a two-day week
4    at the time, and he was gathering the
5    information and he filed it. In fact, I
6    haven't seen him so.
7  Q Do you know who it was?
8  A Oh, God.
9  Q Let me put it this way, do you have the tax
10   returns that he filed?
11 A Do I have them?
12 Q Yes.
13 A Not yet. He probably took an extension, if
14   they don't have them.
15 Q You signed them, though?
16 A I didn't sign anything.
17 Q Not even an extension?
18 A I think I did sign the extension, yeah. I was
19   in Florida when I signed the extension.
20 Q You're expecting him to finish?
21 A Yeah, I thought he was going to be all done by
22   April 15th, but I guess he didn't. He never
23   called me and I never seen anything.
```

Case 1:04-cv-11125-NG   Document 28-31   Filed 03/27/2006   Page 9 of 18

```
 1  Q    Who will pay him?
 2  A    Well, somebody's got to pay him. Me or my son.
 3       Somebody going to have to pay him. Won't be
 4       much money, anyway.
 5  Q    There's a company that I found called IRA
 6       Environmental Specialists, Inc. Are you
 7       familiar with that?
 8  A    Oh, yeah, that's years ago.
 9  Q    What was that?
10  A    It was an environmental company but never did
11       anything. It was formed but it never --
12  Q    Never operated?
13  A    No. Never operated.
14  Q    What about C & L Ready Mix Concrete, Inc.?
15  A    What about it?
16  Q    Is that a company that you've been involved in?
17  A    Years ago. Years ago.
18  Q    And when you say "years ago," what do you mean,
19       how long ago?
20  A    Oh, God, that was when Pezza went out of
21       business. I just closed it.
22  Q    Where was it?
23  A    It wasn't a big thing. It was a little
```

```
 1       U-Haul-type concrete. You came down with a
 2       little trailer. We had the little trailers,
 3       you mix a yard of concrete in it and they take
 4       it home. Homeowners.
 5  Q    Where was it located?
 6  A    It was located at 100 Irons Avenue, but it's
 7       gone.
 8  Q    And did you incorporate that? Were you the
 9       owner of that company?
10  A    My father and I.
11  Q    Is your father still alive?
12  A    No, he is gone.
13  Q    So the company's been out of business since
14       when?
15  A    Oh, probably went out of business in '02. Oh,
16       wait a minute. No. Went out of business in
17       '97. No, '99, I think it was.
18  Q    What makes you say '99?
19  A    My father died around that time. It was only a
20       little, about 25 grand a year. So it was
21       nothing to get excited about.
22  Q    And this LCP Corp., that's a company that holds
23       real estate?
```

```
 1  A    Yes.
 2  Q    Does that still exist?
 3  A    Yes.
 4  Q    And what real estate does it currently own?
 5  A    It owns land. Land. Barren land.
 6  Q    Where is the land?
 7  A    In Rhode Island.
 8  Q    Did it own the land that was sold to the town?
 9  A    I think it did. I think. Some of it -- some
10       of my properties went under LCP Corp. and some
11       of them didn't and stayed under me and my
12       wife's name, but I don't remember that one.
13  Q    Where is the land that it has now? Where in
14       Rhode Island, what town?
15  A    Oh, I have land in North Smithfield. I got rid
16       of a lot of it. North Smithfield is probably
17       the only place I have left, Smithfield. North
18       Smithfield and Smithfield, that's it.
19  Q    When I looked up the company, it sounded more
20       like it was managing real estate. But that's
21       not the case, just owns --
22  A    Well, probably when we set it up we set it up
23       with a big group, you know what I mean? I
```

```
 1       could do anything I want with it. Because I
 2       did have the building, had to have the building
 3       under it. Had to have the building under it.
 4  Q    When you were being pressed for these from the
 5       bonding companies and the line of credit you
 6       had signed them personally, is that why you
 7       liquidated the assets of the LC, LCP?
 8  A    Oh, yeah. Oh, yes.
 9  Q    Did LCP have any employees?
10  A    No. No.
11  Q    So the only property that is left, you think,
12       is North Smithfield and Smithfield?
13  A    Yes. Barren land. That's all.
14            MS. CAMPBELL: Okay. That's it.
15            MR. THOMPSON: I have nothing.
16       (Whereupon this deposition concluded
17            at 12:20 p.m.)
```

```
 1                    C E R T I F I C A T E
 2     UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS
 3
 4          I, Alice M.S. DesVergnes, R.P.R., a
 5     Notary Public within and for the Commonwealth
 6     of Massachusetts, do hereby certify:
 7          That LEONARD A. PEZZA, the witness whose
 8     deposition is hereinbefore set forth, was duly
 9     sworn by me and that such deposition is a true
10     record of the testimony given by the witness.
11          IN WITNESS WHEREOF, I have hereunto set
12     my hand and notarial seal this _____ day
13     of_____, 2005.
14
15                       _____
                         Alice M.S. DesVergnes
16                       REGISTERED PROFESSIONAL REPORTER
17
18     My Commission Expires: October 18, 2007
19          THE FOREGOING CERTIFICATION OF THIS
20     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
21     OF THE SAME BY ANY MEANS UNLESS UNDER THE
22     DIRECT CONTROL AND/OR DIRECTION OF THE
23     CERTIFYING REPORTER.
```

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
Office of the Secretary of State
Matthew A. Brown, Secretary of State

Corporations Division
100 North Main Street
Providence, RI 02903-1335
401.222.3040

# PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR 2004

Filing Period: January 1 - March 1 • Filing Fee: $50.00
(FORM MUST BE TYPED OR PRINTED IN BLACK)

| 1. Corporate ID No. | 2. Name of Corporation |
|---|---|
| 17865 | C. PEZZA & SON, INC. |

| 3. Street Address Principal Business Office | City | State | Zip |
|---|---|---|---|
| 100 Irons Avenue | Johnston | RI | 02919 |

| 4. Business Phone No. | 5. State of Incorporation | 6. SIC Code |
|---|---|---|
| (401) 231-6014 | RHODE ISLAND | 886 |

7. Brief Description of the Character of Business Conducted in Rhode Island
SITE EXCAVATION AND PAVING CONTRACTORS

8. NAMES AND ADDRESSES OF THE OFFICERS: ("X" BOX FOR ATTACHMENT) ☐ FILL IN SPACES BEFORE USING ATTACHMENTS

| President Name | Vice President Name |
|---|---|
| Leonard Pezza | |
| Street Address | Street Address |
| 100 Irons Avenue | |
| City / State / Zip | City / State / Zip |
| Johnston  RI  02919 | |

| Secretary Name | Treasurer Name |
|---|---|
| Leonard Pezza | Leonard Pezza |
| Street Address | Street Address |
| 100 Irons Avenue | 100 Irons Avenue |
| City / State / Zip | City / State / Zip |
| Johnston  RI  02919 | Johnston  RI  02919 |

9. NAMES AND ADDRESSES OF THE DIRECTORS: ("X" BOX FOR ATTACHMENT) ☐ FILL IN SPACES BEFORE USING ATTACHMENTS

10. SHARES AUTHORIZED ("X" BOX FOR ATTACHMENT) ☐ | 11. SHARES ISSUED ("X" BOX FOR ATTACHMENT) ☐

| AUTHORIZED SHARES | | | ISSUED SHARES | | |
|---|---|---|---|---|---|
| Number of Shares | Class/Series | Par Value | Number of Shares | Class/Series | Par Value |
| 1,000 | COMM | NO PAR VALUE | 100 | N/A | NO PAR |

This report must be signed in ink by either the President, Vice President, Secretary, Assistant Secretary, Treasurer, Receiver or Trustee.

File Date: FILED JUL 1 2 2004
Check No.
By: M57423
FOR SECRETARY OF STATE USE ONLY

*17865*

Under penalty of perjury, I declare and affirm that I have examined this report, including any accompanying schedules and statements, and that all statements contained herein are true and correct.

Signature of Officer _____ Date 1-7-04

Print or Type Name of Officer

Title of Officer

Form 630 Rev. 12/03

DEPOSITION EXHIBIT 2  4/6/05 AD



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
Office of the Secretary of State
Matthew A. Brown, Secretary of State

Corporations Division
100 North Main Street
Providence, RI 02903-1335
401.222.3040

# PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR  2004

Filing Period: January 1 - March 1   •   Filing Fee: $50.00
(FORM MUST BE TYPED OR PRINTED IN BLACK)

| 1. Corporate ID No. | 2. Name of Corporation |
|---|---|
| 108143 | Stamp Crete of Rhode Island, Inc. |

| 3. Street Address Principal Business Office | City | State | Zip |
|---|---|---|---|
| 100 Irons Avenue | Johnston | RI | 02919 |

| 4. Business Phone No. | 5. State of Incorporation | 6. SIC Code |
|---|---|---|
| (401) 231-6014 | RHODE ISLAND | 0 |

7. Brief Description of the Character of Business Conducted in Rhode Island
TO PURCHASE CEMENT AND PROCESS IT SO AS TO MAKE CONCRETE, EXCAVATE AREAS WHERE CONCRETE IS TO BE POURED, SELLING AND OTHERWISE DEALING WITH CONCRETE AND RELATED SUBSTANCES.

8. NAMES AND ADDRESSES OF THE OFFICERS: ("X" BOX FOR ATTACHMENT) ☐   FILL IN SPACES BEFORE USING ATTACHMENTS

| President Name | Vice President Name |
|---|---|
| Leonard A. Pezza | Leonard A. Pezza |
| Street Address | Street Address |
| 100 Irons Avenue | 100 Irons Avenue |
| City: Johnston  State: RI  Zip: 02919 | City: Johnston  State: RI  Zip: 02919 |
| Secretary Name | Treasurer Name |
| Leonard A. Pezza | Leonard A. Pezza |
| Street Address | Street Address |
| 100 Irons Avenue | 100 Irons Avenue |
| City: Johnston  State: RI  Zip: 02919 | City: Johnston  State: RI  Zip: 02919 |

9. NAMES AND ADDRESSES OF THE DIRECTORS: ("X" BOX FOR ATTACHMENT) ☐   FILL IN SPACES BEFORE USING ATTACHMENTS

10. SHARES AUTHORIZED ("X" BOX FOR ATTACHMENT) ☐    11. SHARES ISSUED ("X" BOX FOR ATTACHMENT) ☐

| AUTHORIZED SHARES | | | ISSUED SHARES | | |
|---|---|---|---|---|---|
| Number of Shares | Class/Series | Par Value | Number of Shares | Class/Series | Par Value |
| 600 | COMM | NO PAR VALUE | 420 | Common | No par value |

This report must be signed in ink by either the President, Vice President, Secretary, Assistant Secretary, Treasurer, Receiver or Trustee

File Date: 3/12/04
Check No.: 003006
By: [signature]
FOR SECRETARY OF STATE USE ONLY

*108143*

Under penalty of perjury, I declare and affirm that I have examined this report, including any accompanying schedules and statements, and that all statements contained herein are true and correct.

Signature of Officer: [signed] Leonard A. Pezza   Date: 1-7-04
Leonard A. Pezza
Print or Type Name of Officer
President
Title of Officer

Form 630 Rev. 12/03

DEPOSITION EXHIBIT
#3 Pezza
4/26/05



**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**
Office of the Secretary of State

Matthew A. Brown, Secretary of State
Corporations Division
100 North Main Street, Providence, RI 02903-1335
401.222.3040

## PROFIT CORPORATION ANNUAL REPORT FOR THE YEAR 2004

Filing Period: January 1 - March 1 • Filing Fee: $50.00
(FORM MUST BE TYPED IN BLACK)

1. Corporate ID No.: 132984
2. Name of Corporation: Stamped-Concrete, Inc.
3. Street Address Principal Business Office: 54 Lions Ave., Johnston, R.I. 02919
4. Business Phone No.: (401) 231-7033
5. State of Incorporation: RHODE ISLAND
6. SIC Code: 0455
7. Brief Description of the Character of Business Conducted in Rhode Island: INSTALLATION OF CONCRETE SURFACES AND SELLING AND OTHERWISE DEALING WITH THE CONCRETE AND RELATED SUBSTANCES, OF EVERY TYPE AND DESCRIPTION

8. NAMES AND ADDRESSES OF THE OFFICERS

| | President | Vice President |
|---|---|---|
| Name | Leonard A. Pezza | office vacant |
| Street Address | 11 Winsor Ave. | |
| City/State/Zip | Johnston, R.I. 02919 | |

| | Secretary | Treasurer |
|---|---|---|
| Name | Leonard A. Pezza | Leonard A. Pezza |
| Street Address | 11 Winsor Ave. | 11 Winsor Ave. |
| City/State/Zip | Johnston, R.I. 02919 | Johnston, R.I. 02919 |

9. NAMES AND ADDRESSES OF THE DIRECTORS

| Director Name | None |
|---|---|

10. SHARES AUTHORIZED / 11. SHARES ISSUED

| Authorized Shares | | | Issued Shares | | |
|---|---|---|---|---|---|
| Number of Shares | Class/Series | Par Value | Number of Shares | Class/Series | Par Value |
| 600 | | NO PAR VALUE | 300 | common | no par value |

This report must be signed in ink by either the President, Vice President, Secretary, Assistant Secretary, Treasurer, Receiver or Trustee.

*132984 DBC 01/20/04 12:27:06 PM*
File Date: 3-1-04
Check No.: 1115
By: DC
FOR SECRETARY OF STATE USE ONLY

Under penalty of perjury, I declare and affirm that I have examined this report, including any accompanying schedules and statements, and that all statements contained herein are true and correct.

Signature of Officer: [signed]    Date: Feb. 2004
Print or Type Name of Officer: Leonard A. Pezza
Title of Officer: PRESIDENT

Form 630 12/01


DEPOSITION EXHIBIT



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES LANGONE, as FUND MANAGER )
of the NEW ENGLAND TEAMSTERS AND )
TRUCKING INDUSTRY PENSION FUND )
)
Plaintiff, )
) C.A. No. 02cv11815 NG
)
v. )
)
C. PEZZA & SON, INC., )
)
Defendant. )
_____ )

## JUDGMENT

A default has been entered against C. Pezza & Son, Inc. on October 22, 2002 for failing to answer or otherwise defend.

Now, upon application and Declaration of Charles Langone demonstrating that Defendant owes Plaintiff the principal sum of $41,376.27, underpayments and late payment charges in the sum of $1,906.58, interest in the sum of $1,087.44, liquidated damages in the sum of $8,276.25, and attorneys' fees and costs in the sum of $2,101.49; and that Defendant is not an infant or incompetent person or in the military service of the United States, it is hereby:

ORDERED, ADJUDGED AND DECREED that Plaintiff recover from C. Pezza & Son, Inc. the sum of $54,862.42.

Plaintiff reserves its right to conduct an examination of defendant's payroll records and to collect such sums assessed pursuant to that audit which exceed the principal amount and interest stated above.

Dated: 11/27/2002           _____
                            Deputy Clerk    USDJ

DOCKETED



# RHODE ISLAND

Heavy Highway Construction

Agreement

2000 - 2003

Teamsters

Local Union No. 251

affiliated with
Teamsters Joint Council No. 10
and
The International Brotherhood of Teamsters

*Per Jos Bairos, past date is 5/1/05.*


DEPOSITION EXHIBIT

Rhode Island Heavy Highway Construction

2000 - 2003

Teamsters Local Union No. 251

affiliated with

Teamsters Joint Council No. 10

and

The International Brotherhood of Teamsters

This Agreement made as of the first day of May, 2000 by and between the Construction Industries of Rhode Island, hereinafter called the "Association" on behalf of its members, and any Employer who becomes signator to this Agreement, each of which member is hereinafter designated as the employer, and Teamsters' Local Union No. 251, hereinafter designated as the "Union".

## PREAMBLE

This Agreement is entered into to facilitate the adjustment of grievances and disputes between the Employer and Employees; to provide for the continuous employment of labor and to bring about stable conditions in the industry, and to establish necessary procedure for the amicable adjustment of disputes, including wages, hours and working conditions, which may arise between the Employer and Employees.

A notice in writing shall be given to the Local Union of any sale or transfer of the Employer's operation.

This Agreement shall be binding upon both parties, their heirs, successors, assigns and legal representatives, until terminated or amended as hereinafter provided.

For the purpose of preserving the level of benefits set forth in this Agreement, the Employer agrees to refrain from using the services of any person who does not observe at least the level of wages, hours and conditions of employment as established in this Agreement. This paragraph shall pertain only to sand, gravel, stone, asphalt, and ready mix concrete. It is understood by this Section that the parties hereto shall not use any leasing or subcontracting device to a third party to evade this Agreement.

## ARTICLE I
## TERRITORIAL JURISDICTION

This Agreement shall apply to and be effective within the jurisdiction of Local Union No. 251.

## ARTICLE II
## SCOPE OF EMPLOYMENT

(a)     This Agreement shall apply to all highway and heavy construction performed by the Employer. For the purposes of this Agreement "Heavy and Highway Construction" shall include, but is not limited to, the construction of roads, streets, alleys, driveway, sidewalks, guard rails, fences, parkways, parking areas, airports, athletic fields, highway bridges, railroad bridges, railroad and street railway construction projects sewers, viaducts, shafts, tunnels, subways, track elevations, elevation highways, drainage projects, reclamation projects, water supply projects, water power developments, marine work, transmission lines, duct lines, pipe lines, docks, dams, dikes, levees, revetments, channels, channel cutoffs, intakes, dredging projects, jetties, breakwaters, harbors, industrial sites, and all earth moving.

(b)     Operation of trucks of all descriptions, including but not limited to snow plows, dump trucks, semi-dump trucks, low boy trailers, winch trucks, A-frames, distributor trucks, tank trucks used for transporting any type of fuel, water or cement, agitator trucks, mixer trucks, portable truck or trailer, forklift trucks when used in job site, warehouse and storage areas, cement hoppers, euclids, dumpsters, turnarocker, ross carriers, or similar equipment or equipment designated to be used for the performance of the work performed by the use of any of the above equipment as well as the maintenance of such equipment presently served by employees covered by this Agreement.

(c)     The terms of this Agreement shall apply to the transportation of all building and excavating materials and equipment including, but not limited to, stone, salt, lumber, doors, windows, structural steel, bricks, cement blocks, sand, materials, removed from roads, solid asphalt materials, shovels, cranes, bulldozers, compressors and hoisting engines, fuel, water, plowing and removal of snow when done with equipment covered by this Agreement.

(d)     Pick-up trucks, station wagons, panel trucks, shall be operated by Teamsters except when not primarily being used to haul parts, materials and equipment. Pick-up trucks, station wagons, panel trucks, that are primarily used to haul parts, material and equipment to a job site or job sites shall be construed as the vehicles whose fundamental basic assignment and use is for that purpose. Excluded from this category (primarily used) shall be pick-up trucks, station wagons, panel trucks, operated by supervisory personnel and maintenance mechanics and pick-up trucks, station wagons, panel trucks, used intermittently and occasionally for errands and emergencies. The collective use of pick-up trucks, station wagons, panel trucks, as a substitute, or used to circumvent the need and use of a flat rack or service truck that would be primarily used for hauling parts, materials and equipments shall be a violation of this provision.

(e)     In the event that there shall be any dispute concerning jurisdiction regarding the assignment of work, between the Union and any other Union of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, the same shall be submitted for determination to the Construction Division of the Joint Council of the International.

(f)     All work heretofore recognized as being within the jurisdiction of the Union shall continue to be the jurisdiction of the Union, notwithstanding any inconsistent provisions contained in other agreements executed by this Association.

(g)     If a jurisdictional dispute arises, the Union agrees that such dispute shall first be submitted to the local business agent of the Crafts involved for settlement, and if no understanding or agreement is reached within forty eight (48) hours, it will be referred to the International Unions involved for settlement. If no agreement is reached on this level in five (5) days, the parties to the dispute may extend the period for settlement to another fixed date, mutually agreed upon. Pending such settlement, the craft performing the work at the time the dispute arises will continue in such capacity until settlement is reached as above provided, it being agreed that there shall be no stoppage or abandonment of work in regard to any jurisdictional dispute. Existing international jurisdictional agreements shall be respected by both parties.

## ARTICLE III
## UNION MEMBERSHIP

(a)     The Employer recognizes and acknowledges that the Union is the exclusive representative of all employees in the classifications of work covered by this Agreement for the purpose of collective bargaining as provided by the *Labor Management Relations Act of 1947* as amended. The Employer shall not enter into any Agreement or Contract with his Employees, individually or collectively, or with any officer, which in any way conflicts with the terms and provisions of this Agreement. Any such Agreement of Contract shall be null and void.

(b)     All present Employees who are members of the Union on the effective day of this Agreement shall remain members of the Union in good standing as a condition of employment.

(c)     All present Employees who are not members of the Union and *all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on or after the eighth day following the effective date of this Agreement, whichever is the later,* except as otherwise provided for by law.

(d)    A member in good standing is one who is not in arrears in the payment of his initiation fee and periodic dues to the Union. In accordance with the Constitution of the Union, Article X, Section 5(c) all members paying periodic dues to the Union must pay them on or before the last business day of the current month in advance. The Local Union shall notify the Employer when any employee is not in good standing.

(e)    There shall be no discrimination against any workman by reason of race, creed, color, religion, sex, age or national origin.

## ARTICLE IV
## HOURS and OVERTIME

(a)    The regular work day shall consist of eight (8) hours between the hours of 7:00 a.m. and 4:30 p.m. All time before 7:00 a.m. shall be paid at time and one-half the hourly rate. No employee shall be sent home early to compensate for his being called in prior to 7:00 a.m. Any employee required to work through his one-half hour lunch and receiving no lunch break that day shall be guaranteed 8 1/2 hours pay for that day. The 1/2 hour lunch break shall commence between the fourth and fifth hour of work.

Employees are to be paid for all time worked from the yard or plant in traveling to any particular job site. Trucks parked on job sites – employees will be paid upon arriving at their scheduled time.

(b)    The regular work week shall be forty (40) hours; eight (8) hours each day Monday through Friday. On Saturdays, drivers are to be guaranteed four (4) hours pay at the time and one half (1 1/2) rate and shall be paid the time and one half (1 1/2) rate for actual time worked over the four (4) hour minimum. On Sundays, drivers are to be guaranteed four (4) hours pay at the double time rate and shall be paid the double time rate for actual time worked over the four (4) hour minimum.

(c)    All other hours worked except in the case of shifts as hereinafter provided shall be paid at the rate of time and one-half except that work performed on Sunday shall be paid at the rate of double time.

(d)    Whenever more than one shift is employed, except as hereinafter provided, the straight time or regular rate of wages shall apply for each eight (8) hour shift, and work in excess of eight (8) consecutive hours on any shift shall be paid at the rate of time and one-half.

(e)    When three (3) shifts are employed, the starting time shall be Monday 8:00 a.m., 4:00 p.m. and 12:00 a.m., respectively, and the last shift shall have completed a forty (40) hour week by 8:00 a.m. the following Saturday. All work between 8:00 a.m. Saturday and 8:00 a.m. on Sunday shall be paid for at the rate of time and one half and all work between 8:00 a.m. Sunday and 8:00 a.m. Monday shall be paid for at the rate of double time, provided it is on a three shift operation. Each shift shall include one-half hour period for lunch.

(f)    Employees who report to work shall receive not less than eight (8) consecutive hours pay, except in the cases of inclement weather or mechanical failure that directly affects the driver involved where the employee will be guaranteed four (4) hours pay and eight (8) if he works after the fourth (4th) hour. Inclement weather shall be defined to mean raining, snowing, or extreme weather conditions where the prime contractor is not permitted to work the job site. An employee shall be paid from the time he leaves the garage or job site until the time he returns to the garage or job site.

In the months of January, February and March, Ready Mix Concrete Drivers who report to work shall receive not less than (4) consecutive hours pay, and shall be guaranteed six (6) hours pay if they work over four (4) hours and further shall be guaranteed eight (8) hours pay if they work over six (6) hours that day. On those days that the Ready Mix Concrete Driver does not work an eight (8) hour day, the Employer will guarantee eight (8) hours Health Services payments.

(g)    Employees shall be notified the day before what time they are to report the following day. The starting time in any case is to be not later than 8:00 a.m. Employees who report for work shall receive not less than eight (8) straight time hours pay. In the case of inclement weather, an employee may be notified by telephone or telegraph not to report, at any time, up to two (2) hours before starting time.